STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

}
In re: Big Rock Gravel, LLC            }          Docket No. 174-8-08 Vtec
  Act 250 Jurisdictional Opinion     }
}


Decision and Order

Appellant Big Rock Gravel, LLC (Appellant)[1] appealed from Jurisdictional Opinion #2-255 of the District Coordinator of the District 2 Environmental Commission. At the time of the filing of the prefiled evidence in this matter, Appellant was represented by James P.W. Goss, Esq.; at the site visit and at trial, Appellant was represented by a family member, Jennifer Howe, who is not an attorney. The Land Use Panel of the Natural Resources Board is represented by Melanie Kehne, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken on a different day, prior to the hearing day, with the parties and their representatives. The parties were given the opportunity to file prefiled evidence prior to the trial, and to submit written memoranda and requests for findings after the trial. They extended the time for these filings by agreement. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

---

[1] The members of Big Rock Gravel, LLC are Cullen Howe and Seth Howe, the sons of A. Scott Howe.

1

Big Rock Gravel, LLC, owns a sand and gravel pit (the Project Pit) on a ten-acre parcel of land (the Project Property) on Rowe Road in the South Londonderry section of the town of Londonderry, Vermont. Rowe Road runs between the Project Property and the West River. A small stream runs from the northerly end of the Project Pit, under Rowe Road, and into the West River. The Town of Londonderry does not have permanent subdivision bylaws, so that development in Londonderry is subject to Act 250 (10 V.S.A. ch. 151) on project parcels greater than one acre in size, unless it is otherwise exempt.

The Project Pit is a combined ledge and gravel deposit in the lowest slopes of the West River valley, typical of many such deposits along river valleys in Vermont. It contains sand, boulder-to-cobble-sized gravel and granitic gneiss bedrock ("ledge").

A 75-acre parcel of land, including the ten-acre Project Parcel, was owned by Gerald G. and Kathryn N. Walker from 1948 through the end of 1970. The Project Pit is still sometimes referred to as the Walker Pit due to their ownership. The Walkers conveyed it to Richard G. and Ingrid B.S. Biggins on January 4, 1971. The Bigginses apparently subdivided the larger parcel, and conveyed the ten-acre Project Parcel to MacKenzie Construction, Inc., on August 30, 1978.

MacKenzie Construction conveyed it to Michael R. and Carla M. Westine on June 18, 1999. On December 14, 2000, the Westines conveyed the Project Parcel to A. Scott Howe. On February 6, 2007, A Scott Howe conveyed the Project Parcel to his sons Seth Howe and Cullen Howe; a month later, on March 6, 2007, they conveyed it to Big Rock Gravel, LLC.

Project Pit usage before 1970

The Project Property has been used as a commercial sand and gravel pit since at least 1949. In 1949, Clyde Prouty hauled material from the Project Pit for

a three-to-four mile long road project, twenty-four feet in width, plus shoulders. The road bed was deep enough to accommodate large rocks from the pit, so that the total amount of material taken from the pit for that project exceeded approximately 30,000 cubic yards.[2]

In 1958 through 1960, thousands of cubic yards of material were again extracted from the Project Pit to be used in the construction of the Stratton Mountain ski resort.

In 1966 and 1967, a portable crusher was in use at the Project Pit. One hauler, Larry Brown, using a 7-cubic-yard-capacity truck, hauled approximately 1008 cubic yards from the Project Pit in each of those two years, and estimated that four others hauled approximately the same amount as he did from the Project Pit in each of those two years, an extraction rate estimated as at least 5,040 cubic yards per year.[3]

Prior to 1970, based on techniques used in the industry at the time, blasting probably occurred at the Project Pit at a rate of approximately one blasting event per year in which the Project Pit was actually in use.

Project Pit Usage as of June 1, 1970[4] or in 1970 Operation Season

No evidence was presented as to the amount of material extracted from the Project Pit, or the rate of extraction, or the rate of truck traffic, as of June 1, 1970, or in the 1970 operation season.

---

[2] Estimate calculated as (3.5 miles long x 1760 yards per mile = 6160 yards in length) x (24 feet plus two 3 ft shoulders = 30 feet wide, divided by 3 feet per yard = 10 yards in width) x (at least ½ yard in depth).

[3] Although the prefiled testimony of Larry Brown estimated that approximately 15,000 cubic yards in total was hauled from the Project Pit in each of the years 1966 and 1967, his testimony at trial showed that that amount may have instead been split among several pits.

[4] June 1, 1970 is the date on which Act 250, 10 V.S.A. ch. 151, became effective.

Project Pit Usage after 1970 Operation Season

The first evidence presented of any use of the Project Pit after the 1970 operation season addressed the years 1973–1974, when material was needed locally due to serious flooding in the area during 1973. Many thousands of cubic yards of material were hauled from the Project Pit in 1973–1974, including rip-rap and gravel sold to the towns of Londonderry, Winhall, and Jamaica. A crusher was in use in the Project Pit for some period during the 1973 season due to the volume of material needed for repairs after the flood. The extraction rate, and the resulting necessary truck traffic, increased due to the flood substantially over the extraction rates in 1968, the most recent year prior to 1970 about which evidence was presented.

After the 1973–1974 seasons, until A. Scott Howe's purchase of the project property in 2000, no evidence was presented as to the use of the Project Pit for extracting earth material. The Project Pit was allowed substantially to grow up with brush, with a small area remaining open for incidental extraction. The observations of people living in the area over that time period who walked or rode horses along Rowe Road and the West River in the area of the Project Pit, reflect that only minor occasional extraction from the Project Pit, and no blasting or crushing, occurred between the late 1970s and A. Scott Howe's purchase of the Project Property in 2000. It is characteristic of small gravel pits in Vermont that the amount extracted in any year will fluctuate with demand, especially local demand. Nevertheless, from at least 1978 through 1999, so little use was made of the Project Pit that it largely grew up to brush and appeared to be dormant or nearly dormant. Its condition did not exhibit substantial effects on water pollution, erosion, traffic, or aesthetics.

Since 2000, A. Scott Howe and Appellant have added gravel to maintain Rowe Road to allow the passage of gravel trucks, have removed the overgrown

4

brush from the surface of large areas within the Project Pit, and have established gravel roads and ramps inside the Project Pit to facilitate the movement of trucks and extraction equipment.

Since 2000, the Project Pit has operated generally within the hours from 7 a.m. to 3:30–4:30 p.m., Monday through Friday, from April 1 through November 30 of each year, with limited additional use on a Saturday, or at later times or in the winter months, in emergency circumstances when materials from the Project Pit are needed. Appellant uses an independent contractor to perform a single blast in the Project Pit once per year, which also involves drilling holes in the rock face for placement of the explosive charges, prior to the blast itself. Appellant also uses an independent contractor to bring a portable crusher to the pit to crush material on approximately four or five days during approximately two weeks per year. Some of the material is hauled from the Project Pit by ASH, Inc., a business owned by A. Scott Howe. Some of the material is hauled from the pit by customers' own trucks, including by the Town of Londonderry.

Since 2000, a pneumatic rock hammer has been used, during not more than three to five days per year between the blast date and the end of the annual use of the crusher in the Project Pit, to break up large pieces of blasted ledge so that it can be placed in the crusher. A rock hammer is a pneumatic chisel attached to an excavator; the operation of a rock hammer is noisier than other equipment used in the project pit.

Appellant produced no records showing extraction rates during 2000, 2001, and 2002, during the ownership of A. Scott Howe. During Mr. Howe's ownership from 2003 through 2006, as estimated from the loader logs, 12,304 cubic yards were loaded in 2003, 6,944 cubic yards were loaded in 2004, 10,836 cubic yards were loaded in 2005, and 12,320 cubic yards were loaded in 2006. Each of these numbers would have to be reduced by a 0.8 load factor to account

5

for the fact that the trucks are not generally filled to capacity. It would also be necessary to reduce each resulting amount by a 1.7 swellage factor to relate the volume of crushed rock as placed into the trucks to the volume of in-place material excavated. However, as the various historic extraction rates were also provided as estimates of the volume of crushed rock taken from the pit, rather than in terms of the volume of in-place material removed, it is not necessary at this time to perform that calculation.[5]

During Appellant's or its members' ownership in 2007, 7,403 cubic yards of crushed rock was extracted from the Project Pit, resulting from the blasting of 6,500 cubic yards of in-place material. During 2008, Appellant extracted 6,892 cubic yards of crushed rock from the Project Pit, resulting from the blasting of 5,800 cubic yards of in-place material.

Two other gravel pits are located on Rowe Road north of the Project Property. One (the Cobb Lumber Pit) has been inactive for many years; the other (the Rowe Pit) was authorized to extract a total of 9,000 cubic yards of material during the two year period of 2007–2008, and ceased operation by October 1, 2008. Gravel truck traffic has increased markedly over the level of such traffic in the 1990s on Rowe Road during the years 2000 through 2008. Other than during 2007–2008, the increase in truck traffic on Rowe Road over the level in the 1990s has been due to the Project Pit operation.

The increase in usage of the Project Pit since 2000, over its condition during the 21 years of near dormancy from 1978 through 1999 has created the potential for impacts under Act 250 Criterion 1 (water pollution), Act 250 Criterion 4 (erosion), Act 250 Criterion 5 (traffic), Act 250 Criterion 8 (aesthetics), and Act 250 Criterion 9(E) (extraction of earth resources' effect on surrounding

---

[5]  If such calculations are relevant to the enforcement case, No. 68-5-10 Vtec, they may be presented in that case.

land uses and suitability for subsequent alternative use).  10 V.S.A. §§ 6086(a)(1), (4), (5), (8), and (9)(E).[6]

Under Act 250, 10 V.S.A. 6081(b), "[a] development in existence before [June 1,] 1970 does not require an Act 250 permit; however, making a substantial change to such a pre-existing development necessitates an Act 250 permit for all, or part, of the development."  In re Hale Mountain Fish and Game Club, Inc., 2009 VT 10, ¶ 1, n. *, 185 Vt. 613; see also In re Snopeck & Telscher, 269-12-07 Vtec, slip op. at 5 (Vt. Envtl. Ct. June 26, 2008) (Durkin, J.).  If a pre-existing project is abandoned, it loses this exempt status.  Catamount Slate, Inc., 2004 VT 14, ¶ 2, 176 Vt. 284 (citing 10 V.S.A. 6081(b); In re Orzel, 145 Vt. 355, 359 (1985)).

The party claiming the exemption has the burden of demonstrating to the Court that the development was in existence prior to June 1, 1970.  Re Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. Aug 30, 1999) (citing Re John Gross Sand and Gravel, Declaratory Ruling No. 280, Findings of Fact, Conclusions of Law, and Order, at 8 (Vt. Envtl. Bd. July 28, 1993)).[7]  To be entitled to the statutory exemption for a pre-existing development, the party claiming the exemption must also demonstrate that the pre-existing development was not

---

[6] The Court makes no findings as to whether there have been any actual impacts or whether the Project Pit does or does not qualify for Act 250 approval, or under what conditions.  Such considerations are for the District Commission in the first instance, and would only come to the attention of this Court if the District Commission's decision on any Act 250 permit application were to be appealed. This decision also does not address any of the factors to be considered in an enforcement action; the related enforcement action is on inactive status and will be discussed in the scheduled telephone conference (see enclosed notice).

[7] Prior decisions of the Environmental Board are given the same weight and consideration as prior decisions of this Court.  10 V.S.A. § 8504(m).

abandoned, either before June 1, 1970, or since that date. Re U.S. Quarried Slate Products, Inc., Declaratory Rulings Nos. 279 and 283, Findings of Fact, Conclusions of Law, and Order, at 15-16 (Vt. Envtl. Bd. July 30, 1993). It is the party claiming the exemption which must produce information regarding the extraction rates, both before and since June 1, 1970, sufficient for the Court to determine whether a substantial change has occurred. Thomas Howrigan Gravel Extraction, Declaratory Ruling No. 358, at 14 (citing John Gross Sand and Gravel, Declaratory Ruling No. 280, at 8).

The reason for placing this burden upon a gravel pit operator claiming that the gravel pit qualifies for the pre-existing exemption is that "the owner or operator of the gravel pit is the one most likely to possess information on extraction rates" and also because the owner or operator is the one with the best incentive for obtaining the information, as the one "seeking to continue extraction without having to obtain a permit." John Gross Sand and Gravel, Declaratory Ruling No. 280, at 9; see also Godwin v. Fairbanks Morse & Co., 123 Vt. 161, 166 (1962) ("[T]he burden is on the claimant to establish the facts essential to the right asserted.").

The purpose of protecting a pre-existing level of use at the time that Act 250 went into effect is meant to recognize the reasonable expectations of landowners and business owners at the time the new law went into operation, that is, "to avoid the unfairness of suddenly imposing [an unexpected Act 250] permit requirement on existing businesses." Re John Gross Sand and Gravel, Declaratory Ruling No. 280, Memorandum of Decision, at 4 (Vt. Envtl. Bd. Dec. 2, 1993). This is balanced against the reasonable expectations of the surrounding community, so that grandfathering is allowed as long as there has not been a substantial change or increase in the operation, that is, "so long as the impacts of the operation upon the environment or upon the community are no greater after

8

June 1, 1970, than before that date." In re Orzel, Declaratory Ruling No. 174, Findings of Fact, Conclusions of Law, and Order, at 6 (Vt. Envtl. Bd. Oct. 2, 1986), aff'd In re Orzel, 145 Vt. 355.

Appellant argues that the Court should approve, as the level of grandfathered use for the Project Pit, a forty- or fifty-year cycle in which the extraction rate may exceed 15,000 cubic yards in one or two years, followed by a decade or two of dormancy or near-dormancy. Even if the pit was not entirely abandoned during the 1978 through 1999 period, the grandfathering of so long a business cycle would 'not do justice to the legitimate expectations of property owners who reside nearby," U.S. Quarried Slate, Declaratory Rulings Nos. 279 and 283 at 17, and would run contrary to the neighbors' reasonable expectations raised by the twenty-one year period of dormancy. See Re Champlain Marble Corp. (Fisk Quarry), Declaratory Ruling No. 319, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. Oct. 2, 1996).

Appellant's evidence demonstrated that the Project Pit was in regular use during at least the 1967 season and in the years before that. However, Appellant failed to produce sufficient evidence for the Court to conclude that the Project Pit was in use as of June 1, 1970 or during the 1970 season. Additionally, Appellant failed to produce sufficient evidence to demonstrate that the Project Pit was not abandoned during any portion of the period from 1975 through 1999.

In any event, regardless of whether Appellant has proved an extraction rate that occurred in 1970, the evidence before the Court reflects that there was a substantial increase in the use of the Project Pit in 1973–74, followed by near dormancy, if not abandonment, of its use from at least 1978 through 1999, followed by A. Scott Howe's and Appellant's substantial increase in its use from 2000 through 2008. This increase created the potential for impacts under Act 250 Criterion 1 (water pollution), Act 250 Criterion 4 (erosion), Act 250 Criterion 5

9

(traffic), Act 250 Criterion 8 (aesthetics), and Act 250 Criterion 9(E) (extraction of earth resources' effect on surrounding land uses and suitability for subsequent alternative use).

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED than an Act 250 permit is therefore required for the operation of the Project Pit (former Walker Pit), concluding this Jurisdictional Opinion case.

A telephone conference has been scheduled (see enclosed notice) regarding the related enforcement case, Docket No. 68-5-10 Vtec, which has been on inactive status pending the issuance of this decision.

Done at Berlin, Vermont, this 19th day of October, 2010.

_____
Merideth Wright
Environmental Judge