2004 VT 14

### In re Catamount Slate, Inc. d/b/a Reed Family Slate Products, and Fred and Suellen Reed

[844 A.2d 787]

No. 02-142

Present: Amestoy, C.J., Johnson and Skoglund, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned

Opinion Filed February 13, 2004

*David Putter*, Montpelier, and *Stephanie A. Lorentz* of *Lorentz, Lorentz and Harnett*, Rutland, for Appellants.

*William H. Sorrell*, Attorney General, and *Jeanne Elias* and *Wendy Morgan*, Assistant Attorneys General, Montpelier, for Amicus Curiae.

¶ 1. **Johnson, J.** In this appeal from an order of the environmental board, we examine a 1995 amendment to Act 250, 10 V.S.A. chapter 151, delineating the Act's jurisdiction over Vermont's slate quarries. See 1995, No. 30. The central question presented is whether a district coordinator and the environmental board may reopen a final determination issued pursuant to 10 V.S.A. § 6007(c) on a slate quarry's exempt status under Act 250 at the request of neighbors who were not notified of and served with the original opinion holding the quarry exempt. Under the facts presented here, we conclude that the environmental board, and the district coordinator, erred by revisiting the exempt status of plaintiffs' slate quarries registered in accordance with 10 V.S.A. §§ 6007(c) and 6081(1) at the request of three neighbors who did not receive notice of the registration because they were not entitled to it. Accordingly, we vacate the order of the environmental board, and remand the matter for dismissal.

¶ 2. This case takes place against the backdrop of Act 250, 10 V.S.A. chapter 151, the state's historic land-use law. Effective on June 1, 1970, Act 250 was "a philosophical compromise" between protecting and

controlling the state's lands and environment, and avoiding an "administrative nightmare." See *In re Agency of Admin.*, 141 Vt. 68, 76, 444 A.2d 1349, 1352 (1982); see also 1969, No. 250 (Adj. Sess.), § 1 (purpose of Act 250 is to regulate development to ensure that it does not harm environment and that it promotes general welfare and needs of Vermonters). The Act requires certain development projects to obtain a state land-use permit intended to prevent any undue adverse effects on the environment. 10 V.S.A. § 6081(a); see *id.* § 6001(3) (defining development for Act 250 purposes); *id.* § 6086 (setting forth environmental criteria against which project's qualification for permit is assessed). Under § 6081(b), development projects preexisting June 1, 1970 are exempt from the Act's permitting requirements. 10 V.S.A. § 6081(b); *In re Orzel*, 145 Vt. 355, 359, 491 A.2d 1013, 1015 (1985). Preexisting projects lose their exempt status if they are abandoned or they substantially change. 10 V.S.A. § 6081(b); see *In re Orzel*, 145 Vt. at 359, 491 A.2d at 1015 (whether operations were abandoned at any time is relevant to question of preexisting status under Act 250).

¶ 3. In 1995, the Legislature amended Act 250 to clarify its applicability to Vermont's slate quarries. See 1995, No. 30. The legislation followed a temporary moratorium on Act 250 jurisdiction over slate quarries during a period of study by a legislative committee established for that purpose. See 1993, No. 232 (Adj. Sess.), § 37. The 1995 legislation, known as Act 30, was made retroactive to June 1, 1970. 1995, No. 30, § 4. It added a definition of "slate quarry" to 10 V.S.A. § 6001, 1995, No. 30, § 1 (codified at 10 V.S.A. § 6001(25)), and amended § 6081 to clarify the circumstances under which a slate quarry needs an Act 250 permit. *Id.* § 2. It also narrowed the concept of abandonment for slate quarries. Under the amended statute, unused holes that appear abandoned are "held in reserve" and are exempt from Act 250 as long as slate was extracted from them before June 1, 1970 and the owner registers them under § 6081(l). *Id.* § 2(j) (codified at 10 V.S.A. § 6081(j)). The Act exempted ancillary slate mining activities from Act 250 review, and provided that *non*ancillary activities at a quarry could be considered "substantial changes" that would trigger Act 250 jurisdiction. *Id.* § 2(k)(1) (codified at 10 V.S.A. § 6081(k)(1)); see also *id.* § 2(k)(2) (codified at 10 V.S.A. § 6081(k)(2)) (ancillary activities involving crushing may be "substantial changes" for Act 250 purposes if they have a significant impact on any of the ten criteria under § 6086(a)).

¶ 4. Most relevant to this case, Act 30 established a registration process to identify slate quarries that are entitled to grandfathered or exempt status under § 6081(b). The new law gave slate quarry owners until

January 1, 1997 to register their quarries with their district coordinators and town clerks. 10 V.S.A. § 6081(l)(1); see 1995, No. 30, § 2(l). Once completed, the registration documents had to be approved by the district coordinator for "a final determination" on Act 250 jurisdiction through the jurisdictional opinion process of 10 V.S.A. § 6007(c), and be recorded in the relevant municipal land records. 10 V.S.A. § 6081(l)(3)-(4). Registration, approval, and recording rendered a slate quarry exempt from Act 250 jurisdiction absent a substantial change, *id.* § 6081(b), like digging a new hole unrelated to a registered hole. *Id.* § 6081(l)(5). To level the playing field between slate quarries holding Act 250 permits predating Act 30 and slate quarries that had been operating without permits, § 4 of Act 30 provided that "upon issuance to a person of final slate quarry registration documents," any existing Act 250 permit, or part of a permit, "shall be subject to amendment or a finding of lack of jurisdiction." 1995, No. 30, § 4.

¶ 5. To implement Act 30's registration provision, the environmental board approved a slate quarry registration form and prepared instructions to assist the applicant in completing the form. Application for Slate Quarry Registration; Guidelines for Applying for Slate Quarry Registration (hereinafter Slate Quarry Registration Guidelines). Consistent with § 6081(l)(3), the form and accompanying instructions explained that a request for slate quarry registration approval was also a request "for a final determination under subsection 6007(c) of Title 10." Application for Slate Quarry Registration at 1; see Slate Quarry Registration Guidelines at 1 (the "[f]iling of these registration documents constitutes a request for a final determination of jurisdiction under 10 V.S.A. § 6007(c)"). The registration form directed the applicant to list the names and addresses of all adjoining landowners, and to distribute copies of the registration documents to the relevant municipality, municipal planning commission, regional planning commission, and any adjoining municipalities and planning commissions. Application for Slate Quarry Registration at 1-2.

¶ 6. Seeking the protection of the new slate quarry amendment, Catamount[1] filed a slate quarry registration application in October 1996 with the district #1 environmental commission. In its application, Catamount identified four quarry holes on its Fair Haven, Vermont property, claimed that the holes had been used for the commercial extraction of slate before June 1, 1970, and noted the existence of two buildings on the site. As required by the registration form, Catamount provided the names and addresses of all adjoining property owners, and served the

---

[1] Appellants are Fred and Suellen Reed and their company Catamount Slate, Inc. d/b/a Reed Family Slate Products. This opinion refers to appellants collectively as Catamount.

government bodies as the process required. In April 1997, the district coordinator issued a written decision approving Catamount's registration and finding the quarry holes identified in the application as exempt from Act 250 jurisdiction. The district coordinator sent the opinion to state and town officials as well as to the adjoining property owners listed in the application form, namely Kathleen Donna, George Roberts, Lorene Sheldon, and the State of Vermont. None of those served with the approval appealed it or requested reconsideration of it within thirty days as 10 V.S.A. § 6007(c) allows.

¶ 7. In August 1999, two years after the district commission approved Catamount's registration, Kathleen Donna and six other neighbors, David and Joanne Calvi, Joan Gagnon, Lori Ballard, Lee Sheldon, and Lindsey Waterhouse, wrote the district coordinator asking him to reconsider his April 1997 decision approving Catamount's registration. Other than Kathleen Donna and Lee Sheldon, the son of Lorene Sheldon, none of the requesters owned property adjoining the parcel containing Catamount's registered quarries, and Lee Sheldon did not acquire his interest in the adjoining property until 1998, after Catamount's registration had been approved. The neighbors complained that the two buildings Catamount referenced in its slate quarry registration were hunting camps and were not entitled to grandfathered status. The district coordinator agreed, issued a revised opinion excluding those buildings from protection under Act 30,[2] and sent a copy of his decision to six of the requesters, as well as other interested parties. For reasons that are unclear, the district coordinator did not send a copy of the reconsidered order to requestor and adjoiner Lee Sheldon, but instead, sent one to his mother, Lorene Sheldon.

¶ 8. In February 2000, the district coordinator received another request for reconsideration. This second request came from the same seven people who sought reconsideration in 1999, in addition to nonadjoining neighbors Margaret Riter, Richard and Christine Sheldon, Joan Sheldon, Priscilla Waterhouse (spouse of previous requestor Lindsey Waterhouse), and Lorene Sheldon. The second reconsideration request alleged that Catamount's slate quarry was not used for commercial extraction of slate before June 1, 1970, and thus Catamount needed an Act 250 permit to operate the quarry.

---

[2] Although the district coordinator's first reconsidered opinion is not before us, we observe that its conclusion is doubtful under the last sentence of § 6081(k)(1), which states that "[b]uildings that existed on April 1, 1995 ... shall be considered ancillary." In any event, because we conclude that Catamount's registration was final after the appeal period lapsed following the 1997 approval, our observation need go no further.

¶ 9. As an initial matter, the district coordinator determined that individuals who had been served with the 1999 opinion — the Calvis, Joan Gagnon, Lori Ballard, Lindsey Waterhouse, and Kathleen Donna — were time-barred from seeking further review of the matter because they did not ask for reconsideration of it within the thirty-day reconsideration period. The district coordinator concluded that he could address the new request nevertheless because three requesters, Margaret Riter, Christine Sheldon, and Lee Sheldon, were not served with the prior decisions.[3] As he did in 1999, the district coordinator revised the 1997 approval again, concluding that Catamount needed an Act 250 permit for its quarry. In response, Catamount filed a declaratory judgment action with the environmental board appealing the district coordinator's opinion.

¶ 10. Before the board, Catamount argued that its 1997 quarry registration was final and was not reviewable. Catamount claimed that it had followed the statutory and board-mandated steps to register its four quarry holes, and none of the individuals who received notice of Catamount's registration appealed it. Therefore, Catamount argued, none of the present requesters had a right to invoke the authority of the district coordinator or the environmental board to revisit the grandfathered status of Catamount's registered slate quarries.

¶ 11. The board rejected Catamount's argument in a preliminary order. The board reasoned that if Catamount wanted a final opinion on jurisdiction, it should have (1) made clear that it was seeking a final determination under § 6007(c) when it filed its registration application, and (2) asked the district coordinator to serve the opinion on Margaret Riter, Christine Sheldon, and Lee Sheldon. Because Catamount did neither of those things, the board concluded that it and the district coordinator could reconsider Catamount's registration. After the evidentiary hearing that followed, the environmental board concluded that Catamount needed an Act 250 permit to continue quarrying three of its four registered holes. This appeal followed.

¶ 12. On appeal, Catamount claims that the board erred by concluding that it could revisit the jurisdictional question at the behest of three neighbors who were not served with the 1997 jurisdictional opinion. The

[3] The district coordinator found that Priscilla Waterhouse "arguably" received constructive notice of the 1999 opinion because it was served on her husband, Lindsey Waterhouse. The district coordinator and the board premised their jurisdiction on the requests of Margaret Riter, Christine Sheldon, and Lee Sheldon. Although we limit our review of the matter as it relates to those three neighbors, we observe that Priscilla Waterhouse's request could not give the board or district coordinator authority to revisit the preexisting status of Catamount's registered quarry holes for the reasons we explain in this opinion.

State, appearing as amicus curiae, supports the board's interpretation of the statutory scheme. It argues that a jurisdictional opinion under § 6007(c) is final only as to the individuals who receive service of the opinion. Thus, a § 6007(c) opinion can never be final "as to the world." According to the State's theory, Catamount's failure to serve Margaret Riter, Christine Sheldon, and Lee Sheldon gave the district coordinator and the board authority to decide anew whether the quarry holes in Catamount's registration were exempt from Act 250.

¶ 13. Our primary responsibility in resolving this dispute is to ascertain and implement the Legislature's intent, looking first to the statute's language. *Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶ 7, 175 Vt. 61, 819 A.2d 727. Although we normally defer to the environmental board's construction of the statutes comprising Act 250, in this case "there are compelling indications that the construction is wrong," and thus we owe the board no such deference. *In re Agency of Admin.*, 141 Vt. at 74-75, 444 A.2d at 1352.

¶ 14. The board erroneously construed § 6007(c) as requiring Catamount to serve the district coordinator's 1997 decision on Lee Sheldon, Margaret Riter, and Christine Sheldon for the decision to be considered final on the question of Act 250 jurisdiction. Safe harbor under Act 30 was available to slate quarry owners who register and obtain "a final determination regarding the applicability of" Act 250 using the § 6007(c) process. 10 V.S.A. § 6081(l)(3). Section 6007(c) allows an applicant to obtain a "final determination" on the question of Act 250 jurisdiction if the district coordinator, "in accordance with rules of the board, ... serve[s] the opinion on individuals or entities who may be affected by the outcome of the opinion, and on parties that would be entitled to notice under section 6084[4] of this title, if jurisdiction were determined to exist." *Id.* § 6007(c). Failure to appeal a § 6007(c) determination within thirty days renders the opinion "the final determination with respect to jurisdiction under this chapter," unless the opinion was not properly served on § 6084 parties or persons who "may be affected by the outcome of the decision, according to rules of the board." *Id.*

¶ 15. The board's decision below implicitly decides that Margaret Riter, Christine Sheldon, and Lee Sheldon were people "who may be affected

---

[4] Section 6084 prescribes notice procedures upon the filing of an Act 250 permit application. The statute requires notice to the owner of the land if the applicant is not the owner; the municipality in which the land is located; the municipal and regional planning commissions for the municipality in which the land is located; and any adjacent Vermont municipality and municipal and regional planning commission if the land is located on a boundary. 10 V.S.A. § 6084(a).

by the outcome" even though neither Catamount nor the district coordinator identified them as such at the time of Catamount's original registration. Although neither § 6007(c) nor the board's rules define the phrase "who may be affected by the outcome of the opinion," environmental board rule 3(C)(1) does offer us some guidance. Rule 3(C)(1) provides that a decision under § 6007(c) will be final if it is served on "all persons *identified in writing by the requestor, or known to the coordinator,* as either qualifying as parties under Rule 14(A) or who may be affected by the outcome of the opinion." Environmental Board Rule 3(C)(1), 6 Code of Vermont Rules 12 003 001-13 (2003) (emphasis added). The rule ties the phrase "who may be affected by the outcome" to those individuals the requestor's application identifies or individuals that are "known to the coordinator." Thus, a temporal limit applies to the determination of "who may be affected by the outcome" of a jurisdictional opinion issued pursuant to § 6007(c). For the question of Act 250 jurisdiction to be finally settled, therefore, at the time a request under § 6007(c) is made, the requestor must provide the names of all persons the requestor knows may be affected by the outcome of the opinion, and the district coordinator must serve the opinion on those individuals as well as any other individuals "known to the coordinator" *at that time* to be affected by the opinion's outcome. Tying the phrase "who may be affected by the outcome" to a point in time fulfills the Legislature's intent that opinions rendered under § 6007(c) can become final on the issue of Act 250 jurisdiction. As the facts of this case demonstrate, the concept of finality is illusory if the board's authority to reconsider the applicability of Act 250 depends only upon whether the district coordinator served a copy of the opinion on the person seeking reconsideration of it irrespective of the individual's right to notice of it originally.

¶ 16. Consistent with the temporal limit contemplated by the board's rule, the board-approved slate quarry registration form asked the applicant to furnish the names and addresses of all adjoining landowners and directed that the application be distributed to all § 6084 parties (e.g., the municipality, municipal and regional planning commissions, and adjoining municipalities). Thus, the individuals "who may be affected by the outcome" of a slate quarry registration were adjoining landowners at the time of registration only, unless the quarry owner identified other individuals in the registration application. For a slate quarry registration approval to be final under § 6007(c), therefore, the owner had to ensure that the district coordinator served the opinion on the adjoining landowners listed in the application, any individuals the owner identified, and the parties entitled to notice under § 6084.

¶ 17. In this case, Catamount did everything the statutes and the board required of it to obtain a ruling exempting its slate quarries from Act 250 jurisdiction. As the registration application required, Catamount identified all adjoining property owners at the time: Lorene Sheldon, George Roberts, Kathleen Donna, and the State, and all parties entitled to notice under § 6084, such as the Town of Fair Haven. As § 6007(c) requires, the district coordinator sent the registration approval to all adjoining property owners listed in Catamount's application, as well as the § 6084 parties. No appeal or request for reconsideration was filed within thirty days. In fact, the first request for reconsideration came more than a year after the district coordinator approved the registration.

¶ 18. Under these circumstances, after the district coordinator's approval, the 1997 opinion was final on whether Catamount's slate quarry holes were subject to Act 250 review. That the district coordinator did not serve the 1997 opinion on Margaret Riter, Christine Sheldon, and Lee Sheldon does not alter the finality of the jurisdictional question because they were not among the persons Catamount and the district coordinator identified as people "who may be affected by the outcome" of the opinion. Margaret Riter and Christine Sheldon were not entitled to notice and service of the original opinion because they were neither § 6084 parties nor adjoining property owners. Lee Sheldon had no right to notice or service of the 1997 approval because he was not an adjoining landowner at the time the opinion issued nor was he a § 6084 party. The board's decision below faulting Catamount for failing to notify and serve those three individuals in 1997 when neither the board nor the district coordinator identified them as people "who may be affected by the outcome" of the opinion frustrates the intent of § 6007(c) and the purpose of the slate quarry legislation to settle the question of Act 250 jurisdiction. As such, the decision cannot stand.

¶ 19. The State argues that the board's interpretation of the law is correct because § 6007(c) allows "any person" to file a request for a jurisdictional opinion. Thus, the State asserts, nonadjoining neighbors could invoke the district coordinator's authority and challenge the 1997 opinion years after the opinion issues. While we agree that § 6007(c) gives Catamount's neighbors the right to seek an opinion from the district coordinator, we disagree that such a request gave the district coordinator and the board authority to reopen the 1997 opinion exempting Catamount's quarries from Act 250 jurisdiction. The issue of jurisdiction was finally settled once the appeal and reconsideration periods lapsed to challenge the district coordinator's 1997 opinion on Catamount's registration.

¶ 20. We emphasize that the question foreclosed to all of Catamount's neighbors, irrespective of their proximity to Catamount's property, is whether the four quarry holes listed in the registration preexisted Act 250 and are entitled to grandfathered status under the Act. Whether Catamount has substantially changed that preexisting use by, for example, digging a new hole unrelated to the registered holes, see 10 V.S.A. § 6081(l)(5), is an entirely different issue, and one that may be raised and properly considered by way of a § 6007(c) request. Absent some activity triggering Act 250 jurisdiction, however, Catamount is not required to defend its exempt status through repeated requests for an opinion under § 6007(c) by individuals who did not receive service of the 1997 opinion because they were not among the parties entitled to notice of it at the time.

¶ 21. Catamount has raised other arguments challenging the board's final order that Catamount must obtain an Act 250 permit to extract slate from its registered quarries. We do not address those arguments in light of our decision vacating the board's order on jurisdictional grounds.

*The decision of the environmental board is vacated and the matter is remanded for entry of judgment that no Act 250 jurisdiction exists for the slate quarries identified in Catamount's 10 V.S.A. § 6081(l) registration.*