STATE OF VERMONT

SUPERIOR COURT | ENVIRONMENTAL DIVISION
Docket No. 96-8-16 Vtec

| | |
|---|---|
| Laberge Shooting Range JO | DECISION ON MOTION |

**Decision on Motions for Summary Judgment and Motion to Take Judicial Notice**

This is an appeal from an August 2, 2016 Natural Resources Board (NRB) Reconsideration Decision affirming the District #4 Coordinator's determination that a shooting range in Charlotte is subject to Act 250 jurisdiction.[1] The appeal is brought by Laberge & Sons, Inc. (Laberge), which seeks to reverse the NRB decision. Opposing Laberge is the Firing Range Neighborhood Group, LLC, (the Neighborhood Group), which supports the conclusion that the shooting range has triggered Act 250 jurisdiction.

The matter is now before the Court on Laberge's and the Neighborhood Group's cross motions for summary judgment and Laberge's motion for judicial notice. The NRB has filed a memorandum opposing Laberge's summary judgment motion and partly supporting the Neighborhood Group's motion. Laberge is represented by Hans G. Huessy, Esq., the Neighborhood Group is represented by Austin D. Hart, Esq. and Justin B. Barnard, Esq., and NRB is represented by Gregory Boulbol, Esq.

**Motion to Take Judicial Notice**

On June 29, 2017, Laberge filed a motion asking the Court to take judicial notice, pursuant to V.R.E. 201, of a document purported to be the District #4 Coordinator's response to Laberge's June 26, 2017 request for a jurisdictional opinion. The other parties did not respond to the motion.

"A court shall take judicial notice if requested by a party and supplied with the necessary information." V.R.E. 201(d). "A judicially noticed fact must be one not subject to reasonable

---

[1] The August 2, 2016 decision is titled "Reconsideration Decision – Altered;" it was issued after a prior decision to correct the number of the jurisdictional opinion.

dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id. 201(b).

On its face, the document is the District Coordinator's response. In addition the document is a public document. This places the document into the category of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." V.R.E. 201(b)(2). We thus conclude that Laberge's offer that the document is the District #4 Coordinator's response is not subject to reasonable dispute. V.R.E. 201(b). For this reason, the motion to take judicial notice is **GRANTED**.

### Standard of Review

We grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). When considering a motion for summary judgment, we give the nonmoving party the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. Once the moving party meets its initial burden of showing that no material facts are disputed, the burden shifts to the non-moving party to establish a triable issue of fact. Pierce v. Riggs, 149 Vt. 136, 138 (1987). When considering cross motions for summary judgment, "'both parties are entitled to the benefit of all reasonable doubts and inferences' when being considered as the non-moving party." Vermont Coll. of Fine Arts v. City of Montpelier, 2017 VT 12, ¶ 7 (Vt. Feb. 10, 2017) (quoting Montgomery v. Devoid, 2006 VT 127, ¶ 9, 181 Vt. 154).

### Factual Background

The following facts are recited solely to decide the motions for summary judgment now before the Court.

1.      Laberge operates Laberge's Shooting Range in Charlotte, Vermont (the Range).

2.      The Range is situated on a 270-acre tract of land to the north and south of Lime Kiln Road in Charlotte, Vermont. The northern boundary of the tract is on the border between the towns of Shelburne and Charlotte.

3.      Less than ten acres of the tract is used for the shooting range, and the remainder of the property is used for farming.

4.      The Range has been in use for decades.

**1995 JO**

5.      In 1994, neighbors of the Range sought an Act 250 Jurisdictional Opinion related to the Range and a gravel pit operation conducted by Laberge.

6.      In part, the 1994 request suggested the Range was a commercial operation because a donation box had been prominently displayed at the entrance to the Range for a number of years.

7.      An attorney representing Laberge sent a letter to the District #4 Coordinator stating that Laberge did not charge fees for use of the Range, and that the donation box was set up as a temporary measure to contribute to legal fees arising from challenges to the use of the property. A member of the Laberge family also testified in a deposition that he had never received anything in return for use of the Range.

8.      On April 14, 1995, the District #4 Coordinator issued Jurisdictional Opinion #4-113 (the 1995 JO), concluding that the Range was not subject to Act 250 jurisdiction.

9.      The 1995 JO concludes that although the construction of shooting benches in the 1950s was an improvement, the District Coordinator was unable to conclude it was an improvement made for a commercial purpose because there was "no evidence that the use of the shooting range was or has ever been associated with payment of a purchase price, fee, contribution, donation, or other object having value." The 1995 JO therefore concludes that the Range is not a pre-existing development.

10.     For the same reasons—i.e. lack of commercial purpose—the District Coordinator concluded that the Range was not a development at the time the 1995 JO was issued.[2]

**Collection of Donations**

11.     While Laberge claims that the Range has always accepted in-kind donations in the form of labor and materials, the Neighborhood Group disputes this assertion.

12.     The parties agree that from at least 1995 to the present, users of the Range have also made in-kind donations of materials and services. Laberge has organized formal clean-up days for the Range and has solicited donations in connection with those events.

---

[2] As explained in more detail below, Act 250 jurisdiction is triggered in cases such as the one now before us if: (1) there has been construction of improvements (2) on more than ten acres of land (3) for a commercial purpose.

13. It is unclear when Laberge began collecting cash donations, although based on the existence of the donation box this practice appears to have started in the early 1990s.

14. The Range continued to maintain a donation box at its entrance after the 1995 JO was issued.

15. In 2016 the Range began collecting donations via a donations box at Dattilio's Guns and Tackle in South Burlington.

16. The money collected has generally been used to defray costs associated with the Range, including property taxes, insurance, legal fees, maintenance, and repairs.

17. As of recently, Laberge has once again limited the use of donations to help cover legal fees. Laberge asserts that it will not change this use until this appeal is resolved. If the Court determines that Laberge cannot accept donations for any purpose, including to pay legal fees, without triggering Act 250 jurisdiction, Laberge submits that it will cease accepting donations. If the Court determines that Laberge can accept donations only for certain purposes without triggering Act 250 jurisdiction, Laberge states that it will conform its donation policy to that determination.

18. Laberge deposits cash donations to its bank account, marking it "range income" so that it can be tracked, and pays tax on the donations as income.

19. Local police forces use and donate to the Range. The Chittenden County Sheriff's Department gave $200 per year from 2008 to 2013, and $250 in 2014. The Williston Police Department gave $2,200 from 2011 to 2015. The University of Vermont shooting team has given money to the Range, and the National Rifle Association has contributed money to the Range to help cover legal fees.

20. From May 2014 to November 2016 Laberge took in over $47,000 in cash donations for the Range.

**Range Layout**

21. The layout of the Range and infrastructure on the Range has changed over the years.

22. The Range currently has five shooting areas: a skeet shooting range (position 1), three pistol ranges (positions 2, 3 and 4), and a rifle range (position 5).

23. The skeet shooting area was moved from position 5 to position 1 in the 1980s or 1990s.

24. Position 4 was added at some point in the past 20 years.

25. Two additional shooting areas (positions 6 and 7) previously used for pistol and rifle shooting were closed in or around 2012 for safety reasons.

26. Positions 6 and 7 are closer to the property line than position 5.

**Range Infrastructure**

27. At some point, shooting benches were moved from positions 6 and 7 to position 5, a rotting shooting bench at position 5 was removed, and shooting benches at position 5 were repaired or replaced by volunteers.

28. It is unclear how many shooting benches were situated in position 5 in the past. When this appeal was filed, position 5 had six unsheltered, open-air shooting benches. Two of the benches were removed after this appeal was filed.

29. In 2012, Laberge added three earthen berms, each 4–6 feet tall, to position 5. The berms were constructed for safety reasons at the recommendation of Vermont Fish and Wildlife's shooting range team. The berms were removed after this appeal was filed.

30. The parties dispute whether adding the berms and possibly adding or improving the number and location of shooting benches has caused, or has the potential to cause, an increase in use of the range and concurrent increase in noise.

**Range Operation**

31. The Range's posted hours of operation are 8:00 a.m. to 7:00 p.m. Monday through Saturday, and 9:00 a.m. through 7:00 p.m. on Sunday.

32. Shooting occurs outside of the posted hours, although the parties dispute the frequency by which this occurs.

33. The Range is used by the general public, local police forces, and the University of Vermont shooting team.

34. The use of the Range has increased over the years as other shooting ranges in the area have closed.

35. The degree by which the use has increased is disputed by the parties. A number of neighbors have submitted sworn statements attesting to a significant increase in use.

5

36.     Laberge asserts that Range use is seasonal, peaking before deer hunting season and decreasing in the winter.

37.     Shooting at the Range creates noise that is audible at nearby residences.

38.     The parties dispute how disruptive noise from the Range is to nearby residents.  In sworn statements, neighbors claim that the increase in use has been accompanied by a significant increase in noise.

**The 2016 Jurisdictional Opinion**

39.     The Neighborhood Group is comprised of more than 75 individuals from approximately 43 families who live in Charlotte and Shelburne close to the Range.

40.     None of the neighbors who were involved in requesting the 1994 JO are members of the Neighborhood Group.

41.     In November 2015, the Neighborhood Group submitted a request to the District #4 Coordinator for an Act 250 Jurisdictional Opinion.

42.     On February 12, 2016, the District #4 Coordinator issued Jurisdictional Opinion No. 4-247 (the 2016 JO) concluding that the Range is subject to Act 250 jurisdiction.

43.     Laberge filed a request for reconsideration of the 2016 JO with the NRB. The NRB affirmed the 2016 JO on August 2, 2016, and Laberge appealed that decision to the Environmental Division on August 26, 2016.

**The Second 2016 Jurisdictional Opinion Request**

44.     On June 15, 2017, attorney Huessy wrote to NRB attorney Greg Boulbol by email regarding whether 10 V.S.A. § 6081(w)(1)—a new statute exempting certain changes to shooting ranges from Act 250 jurisdiction—is applicable to projects commenced prior to the effective date of that statute.  Attorney Boulbol responded that the NRB believes it is not applicable.

45.     In a letter dated June 26, 2017, attorney Huessy wrote on behalf of Laberge to the District #4 Coordinator indicating that two shooting benches and the berms had been removed from the Range, and asking for a Jurisdictional Opinion concluding that the reinstallation of the benches and berm would not trigger Act 250 Jurisdiction under 10 V.S.A. § 6081(w)(1).

46.     On June 29, 2017, the District #4 Coordinator responded to the June 26, 2017 request, explaining that the appeal of the 2016 JO in the Environmental Division divested the District #4 Coordinator's jurisdiction to issue a decision on the request.

**Permits**

47.     The Range has no state, local, or federal permits apart from a lead management plan approved by the Vermont Agency of Natural Resources on May 30, 2017.

## Statement of Questions

Our review is framed by the eight remaining questions set out in Laberge's Amended Statement of Questions.  Laberge Shooting Range JO, No. 96-8-16 Vtec (Vt. Super. Ct. Envtl. Div. Jan. 4, 2017) (Walsh, J.) (granting in part motion to amend statement of questions).

Questions 1 and 2 address whether the NRB erred in finding that the Range was used for a commercial purpose, and whether the 1995 JO should have estopped the District Coordinator from considering whether the Range is used for commercial purposes.

Question 4 asks whether the District Commission erred in determining that the Range is not used for municipal purposes.

Questions 3, 5, and 6 ask whether the replacement and repair of the shooting benches constituted routine maintenance and repair, whether the replacement and repair of benches and construction of the berms is de minimus and thereby exempt from the definition of "development," and, more generally, whether the repair and replacement of the benches and construction of the berms trigger Act 250 jurisdiction.  Question 8 asks whether, if jurisdiction over the alleged improvements is found, jurisdiction would be limited to those alleged improvements.

Question 7 asks whether there is less than ten acres of involved land.

## Act 250 Jurisdiction Overview

Act 250 requires a permit prior to commencement of construction of certain developments.  10 V.S.A. § 6081(a).  The Act defines "development" as:

> [t]he construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes in a municipality that has adopted permanent zoning and subdivision bylaws.

7

10 V.S.A. § 6001(3)(A)(i).

In short, then, for the purposes of this case, Act 250 jurisdiction is triggered if: (1) there has been construction of improvements (2) on more than ten acres of land (3) for a commercial purpose.

## I.    Whether More than Ten Acres of Land is Involved

Question 7 asks whether there is less than ten acres of involved land.[3]

As a general rule, "involved land" for Act 250 jurisdictional purposes includes "The entire tract or tracts of land, within a radius of five miles, upon which the construction of improvements for commercial or industrial purposes will occur. . . ."  Act 250 Rule 2(C)(5).

There is no dispute that the Range takes up less than 10 acres on a 270-acre lot.  The Neighborhood Group argues that even if the Range is ten acres or less, the Court must consider the entire 270-acre tract as involved land for jurisdictional purposes.  The Neighborhood Group cites the plain language of Rule 2(C)(5) and In re Stokes Communications Corp., 164 Vt. 30, 36 (1995) to support this argument.

In response Laberge points to a series of cases which, it argues, support the proposition that the entire tract is not involved land for jurisdictional purposes when there is no nexus between the project tract and the remaining land, or when the part of the land not involved in the project is dedicated to agricultural use.  See WhistlePig LLC A250 Land Use Permit 9A0348, No. 58-5-14 Vtec (Vt. Super. Ct. Envtl. Div. Sep. 2, 2015) (Durkin, J.); In re Eastview at Middlebury, Inc., No 256-11-06 Vtec (Vt. Envtl. Ct. Mar. 6, 2008) (Durkin, J.), *aff'd*, 2009 VT 98, 187 Vt. 208; Stonybrook Condominium Owner's Assoc., No. 385, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. May 18, 2001).

The circumstances in Stokes are similar to the present case in that a small, discrete portion of a larger tract is the focus of the use that may trigger Act 250.  In Stokes, a corporation leased one acre of a 93-acre lot and built a radio tower on the leased acre without obtaining an Act 250 permit.  Id. at 32.  The corporation later sought to increase the height of the tower and was told by the District Coordinator that an Act 250 permit would be required.  Id. at 33.  The corporation

---

[3] Although not expressly stated in their pleadings, the parties appear to agree that Charlotte has enacted zoning and subdivision ordinances, and is therefore a ten-acre town for Act 250 jurisdictional purposes.

challenged this determination, arguing that construction on the one-acre leased parcel did not trigger the involved-land threshold. Id.[4] The Vermont Supreme Court disagreed and held that the entire 93 acres must be considered involved land. Id. at 36. The Court reasoned in part that the corporation's logic would allow developers to circumvent the ten-acre involved-land jurisdictional threshold by leasing part of a larger tract. Id. at 36–37.

The cases cited by Laberge do not address whether the Court may exclude portions of an overall tract when determining whether Act 250 jurisdiction is triggered. Instead, those cases address whether, after Act 250 jurisdiction is triggered, the scope of the permit can be asserted over the entire tract, or whether the scope should be limited to a more discrete project area. E.g. Eastview, 2009 VT 98, ¶ 13 (explaining that Stokes "neither controls nor is relevant here because the concept of involved land in Stokes is addressed to whether Act 250 jurisdiction is triggered initially, not to the proper scope of a permit").

We conclude that under the plain language of Act 250 Rule 2(C)(5) and Stokes, the entire 270-acre tract is involved land for purposes of determining whether Act 250 applies. Because the 270 acres surpasses the ten-acre threshold set out in 10 V.S.A. § 6001(3)(A)(i), we **GRANT** summary judgment in favor of the Neighborhood Group on Question 7.

## II.     **Whether Improvements Have Been Constructed**

The Neighborhood Group argues that improvements have been constructed on the Range in recent years, including shooting benches, berms, signs, and roads. Laberge asserts that none of these are improvements for the purposes of Act 250.

Act 250 rules define "construction of improvements" as "any physical change to a project site," apart from certain preliminary activities, or de minimus construction that has "no potential for significant adverse impact" under any of the Act 250 criteria. Act 250 Rule 2(C)(3).

### a.   *Whether Roads, Signs, and New or Moved Shooting Areas are Improvements*

Our review is limited to the issues raised in the Statement of Questions, including matters intrinsic to the Statement of Questions. In re LaBerge NOV, 2016 VT 99, ¶ 15 (citing In re Jolley

---

[4] The involved-land rule was then codified at Environmental Board Rule 2(A)(2), which was substantially similar to the current Act 250 Rule 2(C)(5).

Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190) ; see also In re Atwood Planned Unit Dev., 2017 VT 16, ¶ 17 (describing Environmental Division's construction of a Statement of Questions).

The Neighborhood Group argues in its motion and pleadings that roads, signs, and new or moved shooting areas on the Range might constitute improvements for Act 250 purposes. These matters, however, fall outside the scope of the Statement of Questions, and have not been raised in any cross-appeal.

On the question of improvements, the Statement of Questions is limited to berms and shooting benches. Question 3 raises the question of improvements in relation to the berms and benches. Questions 5 and 6 raise the question of the benches. Question 8 addresses "the alleged improvements," apparently referring to the District #4 Commissioner's conclusion that the berms and benches are improvements. None of the Questions now before us raise—either expressly, or intrinsically—the question of whether roads, signs, or new or moved shooting areas are improvements. There is also no general question regarding improvements that might allow us to consider roads, signs, or new or moved shooting areas.

Because these matters fall outside the scope of the Statement of Questions, we are unable to consider whether roads, signs, or new or moved shooting areas are improvements for the purposes of Act 250 because these issues are beyond our jurisdiction.

b. *Whether Changes to Shooting Benches Constitute Repair and Routine Maintenance*

Question 5 asks whether the replacement and repair of the benches constitutes routine maintenance and repair.

Repair and routine maintenance of an existing development does not constitute the construction of improvements for Act 250 purposes. In re Vt. Agency of Transportation (Rock Ledges), DR No. 296 Findings of Fact, Conclusions of Law, and Order (3d. Rev.), at 10 (Vt. Envtl. Bd. Mar. 28, 1997); Atlantic Cellular Co., L.P. and Rinkers Inc., DR No. 340 Findings of Fact, Conclusions of Law, and Order, at 9 (Vt. Envtl. Bd. July 11, 1997). Repair and routine maintenance are activities that do not alter an existing development, but instead prevent alteration that has occurred or would otherwise occur through normal wear and tear. Rock Ledges, DR No. 296, at 10 (Mar. 28, 1997).

Laberge submits that there used to be four shooting benches, that number was increased to six, and that two benches were removed so that currently there are four benches. Laberge argues that the number of shooting benches at present is the same number that existed in the past, and that any work done to repair or replace those four benches constitutes routine maintenance and repair.

The Neighborhood Group and NRB contend that there used to be two benches, and that number was increased to six and then decreased to four. Further, the Neighborhood Group offers that because the number of total benches has increased, the work on the benches is not simply maintenance and repair, but is instead construction of improvements.

The Neighborhood Group also argues that existing benches were replaced with better benches, and that the replacement is therefore an upgrade, and improvement, rather than a maintenance and repair activity. See Nextel Commc'ns of the Mid-Atlantic, DR #362, Findings of Fact, Conclusions of Law, and Order at 20–22 (Vt. Envtl. Bd. Nov. 18, 1998).

The number of benches that existed historically is material to the question of whether the work done is routine maintenance or repair. That historical number is disputed by the parties. It is also not clear on the record now before the Court whether the replacement and repair of existing benches could be considered an upgrade. As material facts are in dispute, both motions for summary judgment on Question 5 are **DENIED**.

      c. *Whether Changes to Shooting Benches and Addition of Berms is de Minimis, with no Potential for Significant Adverse Impact*

Question 6 asks whether the replacement and repair of shooting benches and construction of berms is de minimus, and are therefore not improvements for the purposes of Act 250 jurisdiction.

Act 250 rules exclude from the definition of "Construction of improvements":

construction which the person seeking the exemption demonstrates (i) is de minimis and (ii) will have no potential for significant adverse impact under any of the criteria of 10 V.S.A. § 6086(a)(1) through (10) directly attributable to such construction or to any activity associated with such construction.

Act 250 Rule 2(C)(3)(c).

The exception as drafted puts the burden of proof on the party seeking a determination that a construction is de minimis. See In re Lake Champlain Bluegrass Festival Jurisdictional

Opinion, No. 204-11-10 Vtec, slip op. at 12 (Vt. Super. Ct. Envtl. Div. Jan. 3, 2012) (Durkin, J.). Therefore, Laberge has the burden to establish the exception.

Laberge offers that repair and replacement of the benches and construction of the berms have no impact on any of the Act 250 criteria because they are physically minor, and because they have no impact on the number of people using the Range or the types of guns used. Laberge concedes that use of the Range has increased over time, but argues that this is the result of other shooting ranges closing. Laberge also concedes that use of the rifle range (position 5), where the benches and berms are located, increased when other areas on the Range were closed for shooting. Laberge submits, however, that this had no impact on the overall use of the Range. In addition, Laberge argues that the areas of the Range that were closed (positions 6 and 7) were closer to nearby residential areas than the rifle range is, and so if there was a change when these were closed, that change would have been a decrease in noise reaching residential areas.

NRB and the Neighborhood group argue that the increase in the number of shooting benches has led to increased use of the rifle range, leading in turn to an increase in the amount of noise generated by shooting at the rifle range. Both parties assert that this has the potential to have an adverse impact on the character of the area under Criterion 8. Re: Bull's Eye Sporting Center et al., # 5W0743-2-EB, DR #649 (FCO at 16) (Feb. 27, 1997).

A fact—whether the shooting benches or berms have contributed to an increase in use of the Range—is disputed here. This fact is material, because if the benches or berms do contribute to increased use, they also may contribute increased noise associated with the increased use and would potentially impact the character of the area under Criterion 8.

We are unable to grant summary judgment to Laberge on this point because, giving the Neighborhood Group the benefit of all reasonable doubts and inferences, we are unable to find on the record before us that the benches or berms do not contribute to the increase in use of the Range. We are also unable to grant summary judgment to the Neighborhood Group on this point because, giving all reasonable doubts and inferences to Laberge, we are unable to conclude that the benches or berms do contribute to the increase in use of the Range. In short, material facts are disputed and further evidence is required for the Court to determine whether the de minimis

exception might apply to the benches and berms.  For this reason, both motions are **DENIED** as to Question 6.

       d. *Whether the berms and shooting benches trigger Act 250 jurisdiction under 10 V.S.A. § 6081(w)(1)*

Pursuant to 10 V.S.A. § 6081(w)(1), an Act 250 permit is not required for changes at a shooting range if a jurisdictional opinion issued pursuant to 10 V.S.A. § 6007(c) determines that the range has been in operation since before 2006, it has a lead management plan approved by ANR, and the changes are designed to improve safety, reduce noise, or reduce impacts on air or water quality.

This statutory provision came into effect on July 1, 2016.  2016, Adj. Sess., No. 145, § 31, eff. July 1, 2016.

ANR approved a lead management plan for the Range on May 30, 2017.  In a letter dated June 26, 2017, attorney Huessy wrote to the District #4 Coordinator on behalf of Laberge indicating that the berms and two shooting benches had been removed from the Range, and asking for a Jurisdictional Opinion concluding that the reinstallation of the benches and berms would not trigger Act 250 Jurisdiction under 10 V.S.A. § 6081(w)(1).  On June 29, 2017, the District #4 Coordinator responded to the June 26, 2017 request, explaining that the appeal of the 2016 JO in the Environmental Division divested the District #4 Coordinator's jurisdiction to issue a decision.

The parties now dispute whether § 6081(w)(1) applies in this case.  This issue appears to fall into Question 3, which asks whether the District Coordinator erred in determining that the construction of the benches and berms required an Act 250 permit.

Laberge argues that § 6081(w)(1) operates to exempt the berms and shooting benches from triggering Act 250 jurisdiction.  It is uncontested that the Range has operated since before 2006, and that it has a lead management plan approved by ANR.  Laberge submits that the berms improve safety and protect water quality by capturing and containing lead bullets.  Laberge further contends that repairing the shooting benches improved safety because shooters no longer rely on rotting benches; moving the benches to the rifle range and closing two shooting

13

areas also improved safety and reduced noise levels off site; and consolidating the benches in an area where bullets would be caught in the berms improved safety and protects water quality.

The Neighborhood Group (with NRB joining) argues that the statute does not apply because its clear language requires a party to first obtain a jurisdictional opinion that it applies, and because the statute cannot be applied retroactively.

> 1. Whether the Statute Itself Requires a Jurisdictional Opinion Before any Changes are Made

Pursuant to section 6081(w)(1), an Act 250 "permit or permit amendment shall not be required for a change to a sport shooting range . . . if a jurisdictional opinion issued under [10 V.S.A. § 6007(c)] determines that" the range was in operation before 2006, it has an approved lead management plan, and the change is for safety or to remediate noise or environmental impacts. Under 10 V.S.A. § 6007(c), "with respect to an activity which might or might not constitute development, any person may submit to the district coordinator an 'Act 250 Disclosure Statement' and other information required by the rules of the Board, and may request a jurisdictional opinion from the district coordinator concerning" whether the activity requires an Act 250 permit.

Our primary goal in construing a statute is to effect the intent of the drafters; we begin by looking to whether the statute's plain language reveals that intent. In re Spring Brook Farm Found., Inc., 164 Vt. 282, 285 (1995). The plain language of 10 V.S.A. § 6081(w)(1) states that certain changes might not trigger jurisdiction if a jurisdictional opinion determines that certain enumerated criteria apply. The plain language of 10 V.S.A. § 6007(c) states that a person can request a jurisdictional opinion regarding whether an activity might require an Act 250 permit. Neither statute says anything to the effect that a person must obtain a jurisdictional opinion before making changes that might require an Act 250 permit, or changes that might be exempt from permitting requirements under § 6081(w)(1).

Beyond the plain language of the statute, we are also instructed to read statutes in context of the entire statutory scheme. Blundon v. Town of Stamford, 154 Vt. 227, 230 (1990) (citation omitted). Under 10 V.S.A. § 6081(a), a person must obtain an Act 250 permit prior to commencement of development or construction on a development subject to Act 250

14

jurisdiction. Reading §§ 6081(a) and 6007(c) together, one can infer that if a permit is required prior to construction, then a jurisdictional opinion should probably be obtained prior to construction. At the same time, this does not mean that if a permit is not required, a jurisdictional opinion should be obtained prior to construction.

In practice, this question is somewhat academic. As a general rule, it is probably wise to determine whether a permit is required before carrying out a development. See, e.g., Village of Ludlow v. Kenneth Tofferi and Totem Pole Ski Shop, Inc., No. 213-11-98 Vtec (Vt. Envtl. Ct. Jan. 18, 2002) (Wright, J.) (levying a monetary penalty on party for failure to comply with court order to remove portion of building built within a setback without a permit).

Nevertheless, failing to request or obtain a jurisdictional opinion or Act 250 permit prior to development that triggers Act 250 jurisdiction does not prevent a party from requesting a jurisdictional opinion after the fact, e.g. Lake Champlain Bluegrass, No. 204-11-10 Vtec at 2–4 (Jan. 3, 2012), or applying after the fact for an Act 250 permit, e.g. In re Gregory Hovey Act 250 Permit, No. 2015-205, slip op. at 1 (Vt. Nov. 20, 2015) (unpublished mem.); Korrow Real Estate, LLC Act 250 Permit Amendment Application, No. 29-3-16 Vtec, slip op. at 2 (Vt. Super. Ct. Envtl. Div. Mar. 23, 2017) (Durkin, J.).

Allowing after-the-fact jurisdictional opinions and permits is a common, and common-sense, land management practice. Strictly requiring jurisdictional opinions to be obtained before development commences could lead to absurd results—a party could make an improvement that is exempt under § 6081(w)(1), and then have to remove the improvement for the unintentional failure to obtain a jurisdictional opinion that subsequently allows the improvement to be put back in place. Braun v. Bd. of Dental Exam'rs, 167 Vt. 110, 117 (1997) (statutes construed with presumption "that the Legislature does not intend an interpretation that would lead to absurd or irrational consequences").

For these reasons, we conclude that the failure to obtain a jurisdictional opinion regarding the applicability of § 6081(w)(1) to changes at a shooting range prior to making those changes does not bar the statute from being applied after the fact to those changes.

15

2.        Whether 1 V.S.A. § 214 bars retroactive application

The Neighborhood Group argues that § 6081(w)(1) cannot be retroactively applied to the improvements alleged here.   They cite 1 V.S.A. § 214, under which an amendment to a statute may not affect any "obligation or liability . . . incurred prior to the effective date of the amendment," nor impact any proceeding to enforce or give effect to an obligation or liability under the prior statute.

Laberge responds that the retroactivity issue is mooted by its removal of the berms and benches.  The Neighborhood Group counters that, even after the removal, there are two more benches than there used to be.

The Neighborhood Group contends that, under 1 V.S.A. § 214, Laberge had obligations under Act 250 from the moment the Neighborhood Group requested a jurisdictional opinion in 2015.  To support this proposition, the Neighborhood Group cites Lake Champlain Bluegrass, No. 204-11-10 Vtec (Jan. 3, 2012).  In that case we determined that if a rule or statute went into effect after an Act 250 proceeding commenced, and we applied that rule or statute to the proceeding, then we have applied the rule or statute retroactively for the purposes of 1 V.S.A. § 214.  Id. at 10.  We further explained that "the activity commencing the Act 250 proceeding is either some showing that Act 250 jurisdiction does apply to the landowner's previous activities or the submission of a request by a party for a jurisdictional opinion from a district coordinator."  Id. We concluded that the new statute in that case—the de minimus exception—went into effect before the jurisdictional opinion request was filed, and so applying the statute was not retroactive.  Id.[5]

The reasoning in Lake Champlain Bluegrass is reminiscent of our vested rights doctrine, under which a permit applicant vests in the statutes and rules in effect at the time a completed application is filed.    Smith v. Winhall Planning Comm'n, 140 Vt. 178, 180 (1981).  Under our vested rights doctrine, if statutes or rules change in a way that is favorable to the applicant before there is a final decision on the application, the applicant can take advantage of the newer, more

---

[5] This was despite the fact that the improvements we determined to be de minimis were installed in 2006, while the de minimis exception did not go into effect until 2009.  Lake Champlain Bluegrass, No. 204-11-10 Vtec at 8 (Jan. 3, 2012).

16

favorable statutes and rules.  In re Times & Seasons, LLC, 2011 VT 76, ¶ 16, 190 Vt. 163; In re John A. Russell Corp., 2003 VT 93, ¶ 13, 176 Vt. 520 (mem.).

Even if the application of § 6081(w)(1) here is retroactive, we do not believe that is barred by 1 V.S.A. § 214.  Because the jurisdictional opinion is still on appeal, Laberge does not have a pre-existing obligation or liability in the form of a final opinion requiring an Act 250 permit.  As in our vested rights doctrine, before a final decision is rendered, Laberge should be able to avail itself of the favorable change in law that § 6081(w)(1) may represent.  We are also reluctant to extend Lake Champlain Bluegrass to create something akin to a vested rights doctrine applicable to jurisdictional opinions, where the rights of a person who may or may not be subject to Act 250 jurisdiction vest at the moment a third party files a request for a jurisdictional opinion.

Because the plain language of 10 V.S.A. §§ 6081(w)(1) and 6007(c) do not require a jurisdictional opinion to be issued prior to improvements or development, and because 1 V.S.A. § 214 does not bar retroactive application of § 6081(w)(1) in this case, we conclude that Laberge may in theory avail itself of the exemption set out in § 6081(w)(1).  On the record now before us, however, we are unable to determine whether the exemption applies.  In particular, it is not clear on the record before us whether the berms and shooting benches meet the criteria set out in § 6081(w)(1)(C).  Summary judgement is therefore **DENIED** as to both motions on Question 3.

### III.    <u>Whether the Range is Used for a Commercial Purpose</u>

The Neighborhood Group argues that while the Range did not originally operate for a commercial purpose, in more recent years the use has changed and become commercial. Laberge argues that it takes donations from users of the Range and uses these to cover operational costs, that this has not changed over time.  Laberge argues that the Range either does not operate for a commercial purpose, and never has; or, if the Range does operate for a commercial purpose, that it has always done so, and is therefore a pre-existing development that predates, and is not subject to, Act 250.

#### a.  *Whether Res Judicata Bars Certain Arguments under the 1995 JO*

The NRB argues that Laberge is barred by res judicata from arguing now that the Range has always been commercial, and is therefore a pre-existing development, because the 1995 JO concluded that the Range is not a pre-existing development and that decision was not appealed.

See Nat. Res. Bd. Land Use Panel v. Dorr, 2015 VT 1, ¶ 10, 198 Vt. 226 (holding that res judicata precludes a party from contesting whether an Act 250 permit is required when a final, unappealed jurisdictional opinion determined that a permit is required).

Under res judicata, "a final judgment in previous litigation bars subsequent litigation if the parties, subject matter, and cause(s) of action in both matters are the same or substantially identical." Id. (quoting Faulkner v. Caledonia Cnty. Fair Ass'n, 2004 VT 123, ¶ 8, 178 Vt. 51). "The doctrine 'bars parties from relitigating, not only those claims and issues that were previously litigated, but also those that could have been litigated in a prior action.'" Id. (quoting Carlson v. Clark, 2009 VT 17, ¶ 13, 185 Vt. 324). Facts material to this legal doctrine are disputed. The cross motions are therefore **DENIED**.

At trial, the parties should focus on the 1995 JO, and the facts upon which it was based, as well as factual changes or consistencies since that time. This is because Act 250 jurisdictional opinions are final and binding only as to the facts they are based on. In re Catamount Slate, Inc., 2004 VT 14, ¶ 20, 176 Vt. 284. A JO is only as good as the facts presented to the District Coordinator. WhistlePig, LLC Act 250 JO(#9-070), No. 21-2-13 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Apr. 11, 2014) (Durkin, J.) (citing Lake Champlain Bluegrass, No. 204-11-10 Vtecat 11 (Jan. 3, 2012).

### b. *Whether Judicial Estoppel Applies*

The Neighborhood Group argues that the doctrine of judicial estoppel bars Laberge from arguing that if the Range is commercial now, it has always been commercial.

Judicial estoppel bars a party from taking a position in a legal proceeding that is contrary to a position taken in an earlier proceeding. New Hampshire v. Maine, 532 U.S. 742, 749 (2001). The Vermont Supreme Court has not decided whether to adopt the doctrine, see, e.g., Gallipo v. City of Rutland, 173 Vt. 223, 237 (2001), and we are reluctant to apply it in this case.

Even if we were to apply judicial estoppel, it is not clear the doctrine would bar Laberge's current arguments. In the past, Laberge conceded that it accepted donations, but argued that the Range is not commercial because it does not provide access to the Range in exchange for anything. Laberge makes the same argument today, but adds that if the Range is considered

commercial today, then it has always been commercial, because its manner of operation has not fundamentally changed.  These positions are not necessarily opposed or contradictory.

c. *Whether the Range has a Commercial Purpose*

Question 1 asks whether the NRB erred in concluding that the Range is used for a commercial purpose.

The Act 250 Rules define commercial purpose as "the provision of facilities, goods or services by a person other than for a municipal or state purpose to others in exchange for payment of a purchase price, fee, contribution, donation or other object or service having value." Act 250 Rule 2(C)(4).  The Vermont Supreme Court has emphasized that application of the rules defining commercial purpose and commercial dwellings should focus on the actual use of the land and the impact of that use, and not necessarily the nature of the institution carrying out the use or the overall purpose of the development scheme.  In re S-S Corp./Rooney Hous. Developments, 2006 VT 8, ¶ 16, 179 Vt. 302 (citing In re Spring Brook Farm Found., 164 Vt. 282, 287 (1995); In re BHL Corp., 161 Vt. 487, 490 (1994)).

In In re Baptist Fellowship of Randolph, Inc., the Vermont Supreme Court looked to Environmental Board Rule 2(L), an earlier and virtually identical version of Act 250 Rule 2(C)(4), to determine whether construction of a meetinghouse by a church is a development with a commercial purpose.  144 Vt. 636, 636 (1984).  The church received most of its income through donations and contributions from its members, but its facilities and services were available to members and non-members alike.  Id. at 639.  The church argued that because the services and facilities at the meeting house would be provided to all comers, they were not necessarily provided "in exchange for" anything.  Id.

The Supreme Court disagreed, explaining that the church's proposed interpretation of "donation" and "contribution" as requiring a quid pro quo exchange would render those terms superfluous, because by definition they connote giving something without consideration.  Id.  The Court concluded that although there was no quid pro quo exchange, there was a "de facto exchange of the Church's facilities and services for donations and contributions," because it was clear that the church would not be able to provide those facilities and services without the donations and contributions.  Id.

Eleven years after Baptist Fellowship, and six months after the 1995 JO was issued in this case, the Supreme Court issued In re Spring Brook Farm Foundation, Inc., 164 Vt. 282, (1995). In that decision, a three-justice majority held that donations to a nonprofit organization to support construction of a dormitory and residence hall to house students and teachers free of charge satisfied the "exchange element of the commercial purpose test" for determining Act 250 jurisdiction. Spring Brook, 164 Vt. at 283–84.

As in Baptist Fellowship, the majority noted that Act 250 rules include the words "donation" and "contribution" in defining commercial purposes, and that nonprofits are not exempt from Act 250 jurisdiction because the Act is more concerned with how land is used than who is using the land. Id. at 286–87. The Court further explained that use of the word "exchange" in defining commercial activity serves "to separate development for use by others from development for personal use," and that the "crucial element" regarding whether there is a commercial purpose is "whether the developer provides goods or facilities to others in exchange for something of value." Id. at 287–88. Two justices disagreed with the majority that the exchange element was satisfied under this factual scenario. Id. at 290 (Allen, J., concurring on other grounds, and Dooley, J., dissenting).

Under Spring Brook, that the Range is available to the general public and not only for personal use suggests that the Range may have a commercial purpose. However, the controlling question under Baptist Fellowship and Spring Brook appears to be whether the Range is available to the public because of the donations it receives, or whether those donations are incidental and the Range would be available regardless of whether donations are given. In addition, the 1995 JO is binding as to the facts it is based on. Catamount Slate, 2004 VT 14, ¶ 20. The parties' evidence should focus on changes in the donations since the 1995 JO was issued, or any other changes in the operation of the range. The facts material to the question of commercial purpose are disputed. Both motions are therefore **DENIED**.

### Order

1. The Neighborhood Group's motion for summary judgment on Question 7 is **GRANTED**.

2. The motions for summary judgment are **DENIED** as to the remaining questions because material facts are disputed.

Please see the enclosed notice of status conference.  At the conference, parties should be prepared to identify any further pre-trial necessities, a trial ready date, and the expected length of trial.

Electronically signed on August 15, 2017 at 03:11 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division