# In re Spring Brook Farm Foundation, Inc.

[671 A.2d 315]

No. 94-332

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed October 27, 1995

*Stephen R. Crampton* and *Dennis R. Pearson* of *Gravel and Shea*, Burlington, for Appellant.

*John D. Hansen*, Rutland, for Appellee.

*Jeffrey L. Amestoy*, Attorney General, and *Mary L. Borg*, Assistant Attorney General, Montpelier, for Amicus State of Vermont.

**Johnson, J.** Today, we conclude that the exchange element of the commercial purpose test for determining Act 250 (10 V.S.A. §§ 6001-6108) jurisdiction incorporates projects where a third person pays the provider of the facility goods or services for the benefit of another. Accordingly, we affirm the Environmental Board's decision requiring Spring Brook Farm Foundation, Inc. (Foundation), a charitable organization, to obtain an Act 250 land use permit prior to constructing a dormitory/residence hall on a 44.5-acre tract.

The Foundation is a New York not-for-profit corporation recognized by the Internal Revenue Service (IRS) as a public charitable foundation. The Foundation was formed "to receive and administer funds for scientific, educational, and charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code . . . and in this connection to bring underprivileged children to a rural setting." The

Foundation is registered to do business in Vermont for the purpose of providing inner-city children "the opportunity to visit a working farm and observe animal husbandry, crop cultivation and harvesting and, through this, to expose the children to usable, practical skills in farming and related areas." In 1992, consistent with its stated purpose, the Foundation purchased the 569.5-acre Spring Brook Farm from the Vermont Land Trust with the intent of establishing its "Farms For City Kids" program there.

Members of the Hagedorn family, the owners of Stern's Miracle-Gro Products, Inc., provided most of the initial funding for the Foundation. The president of the Foundation's Board of Directors, James Hagedorn, is also the Executive Vice-President of Stern's Miracle-Gro Products. Intending to become self-supporting, the Foundation plans to solicit charitable donations from the general public and business community. The Foundation refuses to accept any payments or funds from the students, their parents, or the schools involved in the program.

Because of restrictive covenants governing the farm property, the Foundation purchased an adjacent 44.5-acre tract on which it proposes to construct a two-story classroom/residence hall containing 5425 square feet. The proposed building is intended to house the children and their teachers in six four-person bedrooms, two single bedrooms, and numerous common areas. The building would also serve as a classroom for the program.

Once in operation, the Foundation expects to bring groups of up to twenty students, advertised in the Foundation's promotional literature as "Miracle-Gro kids," along with two teachers, to Spring Brook Farm. The students, primarily from grades four to six, will stay at the Farm for one to three weeks. During this time, they will participate in the daily life on the Farm, learning about agriculture, forestry and the environment. The program is expected to run up to nine months each year.

In June 1993, the Foundation requested an advisory opinion from the District 2/3 Environmental Commission Coordinator to determine whether the proposed classroom/residence hall would be subject to Act 250 jurisdiction. The Coordinator concluded that the project required an Act 250 permit, and the Foundation appealed to the Environmental Board. The Board also concluded that the project triggered Act 250 jurisdiction. It reasoned that the project was a development because it was a construction of improvements on a tract of land involving more than ten acres for a commercial purpose. See

10 V.S.A. § 6001(3). The Board concluded that the commercial purpose test was satisfied, within the language of Board Rules 2(L) and 2(M), because the Foundation would provide facilities to the students in exchange for contributions and donations by third parties. The Foundation appeals.

Vermont's land use law, Act 250, requires a permit prior to the commencement of any development. 10 V.S.A. § 6081(a). A development includes the construction of improvements on a tract of land involving more than ten acres for commercial or industrial purposes. *Id.* § 6001(3). The Board has defined "commercial purpose" as "the provision of facilities, goods or services by a person other than for a municipal or state purpose to others in exchange for payment of a purchase price, fee, contribution, donation or other object having value." Environmental Board Rule 2(L). The Board includes a commercial dwelling within the concept of a commercial or industrial purpose. *Id.* 2(A)(2). A "commercial dwelling" is

> any building or structure or part thereof, including but not limited to . . . dormitories and other places for the accommodation of people, that is intended to be used and occupied for human habitation on a temporary or intermittent basis, in exchange for payment of a fee, contribution, donation or other object having value.

*Id.* 2(M). These Board rules were ratified by the Legislature in 1985; therefore, they have the same force and effect as any other law passed by the Legislature. 1985, No. 52, § 5; *In re Spencer*, 152 Vt. 330, 336, 566 A.2d 959, 962 (1989).

On appeal, we will defer to the Board's interpretation of Act 250 and its own duly promulgated rules, unless there is a compelling indication of error. *In re BHL Corp.*, 161 Vt. 487, 490, 641 A.2d 771, 773 (1994). Indeed, the Board's application of Act 250 to a specific project is entitled to a presumption of validity. *In re Burlington Hous. Auth.*, 143 Vt. 80, 83, 463 A.2d 215, 217 (1983).

The central issue in this case is whether Rules 2(L) and 2(M) require a direct exchange between a provider and recipient of services. Because the rules have been ratified by the Legislature, we must follow the rules of statutory interpretation.* The primary goal

---

*The Legislature's ratification of these rules defeats the argument that the Agency exceeded its statutory authority in promulgating the rules. Our consideration of the Legislature's intent must be based both on the statute and on the rules.

in construing a statute is to effectuate the intent of the Legislature, and we will presume the Legislature intended the plain meaning of the statute. *Bisson v. Ward*, 160 Vt. 343, 348, 628 A.2d 1256, 1260 (1993). "[W]hen the meaning of a statute is plain and unambiguous on its face, it must be enforced according to its express terms." *In re Burlington Hous. Auth.*, 143 Vt. at 83, 463 A.2d at 217.

▇ The plain language of the definition of "commercial purpose" in Rule 2(L) includes the Foundation's program. The elements of the rule require: (1) the provision of facilities, goods or services, (2) by a person, (3) other than for a municipal or state purpose, (4) to others, (5) in exchange for, (6) payments of a purchase price, fee, contribution, donation or other object having value. All of these elements are satisfied. The classroom/residence hall is provided by the Foundation (not for municipal or state purposes) to underprivileged children in exchange for donations and contributions.

▇ Similarly, the plain language of the definition of "commercial dwelling" in Rule 2(M) also includes the Foundation's program. The elements of Rule 2(M) require: (1) any building or structure or part thereof, (2) intended for human habitation, (3) on a temporary or intermittent basis, (4) in exchange for, (5) payment of a fee, contribution, donation, or other object having value. The classroom/residence hall is intended for the children and their teachers during their one-to-three-week stay in exchange for donations and contributions.

▇ The Foundation argues that the "in exchange for" element in both definitions is not satisfied because the beneficiaries of the facility — the underprivileged children — do not provide the payment. In essence, the Foundation claims the definition implies the requirement of a direct exchange. We disagree. Nothing in the statute or the policy of Act 250 mandates a direct exchange.

The language of the definitions — specifically, the words "donation" and "contribution" — implies that the drafters did not intend to require a direct exchange. Donations and contributions convey the concept of giving; "a person cannot be required to give a donation in exchange for some consideration [because] by its very definition a gift is a voluntary transfer without consideration." *In re Baptist Fellowship of Randolph, Inc.*, 144 Vt. 636, 639, 481 A.2d 1274, 1276 (1984). Any direct exchange requirement would impermissibly render these terms superfluous. *Trombley v. Bellows Falls Union High Sch.*, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993); *Baptist Fellowship*, 144 Vt. at 639, 481 A.2d at 1276.

Moreover, the plain meaning is consistent with the purpose of the statute, its subject matter, its effects and consequences, and the reason and spirit of the law. *Nash v. Warren Zoning Bd. of Adjustment*, 153 Vt. 108, 112, 569 A.2d 447, 450 (1989). The purpose of Act 250 is "to protect and conserve the lands and the environment of the state and to insure that these lands and environment are devoted to uses which are not detrimental to the public welfare and interests." 1969, No. 250 (Adj. Sess.), § 1. The Act requires a focus on the impact of the land use, not the nature of the institutional activity. *Baptist Fellowship*, 144 Vt. at 639, 481 A.2d at 1276; see *In re BHL Corp.*, 161 Vt. at 490-91, 641 A.2d at 773 (approving Board's premise that proper starting point for determining Act 250 jurisdiction is actual use of land).

In determining whether activity constitutes a commercial purpose, as defined in Rule 2(L), it is important to consider the distinction the drafters were trying to make. Commercial development in relation to land use implies regular use by multiple parties. By using the word "exchange," the Board intended to separate development for use by others from development for personal use. In fact, the definition of "commercial purpose" specifically requires that the services be provided "to others."

It is irrelevant whether the funding is derived from the actual beneficiary of the project or a third party because such distinctions do not affect land use. The Legislature apparently recognized that funding distinctions were irrelevant to land use. Notably, while certain land uses are specifically exempt from Act 250 jurisdiction, nonprofit uses are not so excluded. *Baptist Fellowship*, 144 Vt. at 640, 481 A.2d at 1276; 10 V.S.A. § 6001(3). To permit the distinction of profit versus nonprofit, or payment by beneficiary versus donation by a third party, to affect application of land use regulations would allow charitable organizations, whose projects may substantially affect land use, to escape the purview of Act 250 merely because their funding is different from other organizations. See *In re Southview Assocs.*, 153 Vt. 171, 175, 569 A.2d 501, 503 (1989) (Court must avoid construction that would render statute ineffective or irrational).

The jurisdictional determination properly focuses on the developer. The definition requires that the developer get something of value in exchange for providing the facilities, goods or services. In considering the developer's activity, it is irrelevant whether the payment comes from the beneficiary of the facilities, goods, or services or from a third

party. All that is required is some sort of exchange between the developer and another party. Similarly, the law of contract formation requires some sort of consideration regardless of whether it is provided by the beneficiary of the contract or a third party. See 2 J. Perillo & H. Bender, Corbin on Contracts § 5.12 (rev. ed. 1995).

We conclude that an indirect exchange is sufficient to satisfy the commercial purpose test of Rule 2(L) — that is, it is not necessary that the person providing the payment be the person who receives the benefit from the facility or service. The crucial element of the commercial purpose test for determining Act 250 jurisdiction is whether the developer provides goods or facilities to others in exchange for something of value. In this case, the Foundation will provide a facility to underprivileged children in exchange for donations and contributions.

Application of the commercial purpose test in this case is entirely consistent with previous applications of the test. In *BHL Corp.*, the landowner provided shale to others in exchange for money and use of excavation equipment. 161 Vt. at 491, 641 A.2d at 773-74. In *Vermont Agency of Natural Resources v. Duranleau*, 159 Vt. 233, 237-38, 617 A.2d 143, 146 (1992), the landowner provided crushed rock to the town in exchange for money and an enlarged business site. In *Baptist Fellowship*, the church provided a sanctuary to its members in exchange for donations. 144 Vt. at 639-40, 481 A.2d at 1276. In these cases, the commercial purpose test was satisfied because the developer received something of value in return for providing the goods or facility to others.

The Foundation contends that our reliance on a de facto exchange in *Baptist Fellowship* mandates a different result. The Foundation misplaces the emphasis of that case. While many of the contributors actually benefitted from the church's facilities, we specifically noted that the church, much like the Foundation, did not require such an exchange. *Baptist Fellowship*, 144 Vt. at 639, 481 A.2d at 1276. Moreover, the determination of Act 250 jurisdiction also relied on the inclusion of the words "donation" and "contribution" in the language of the definition and on the policy of Act 250, favoring a focus on land use rather than the particular institutional activity associated with that land use. *Id.*

The Foundation further argues that this interpretation of the rule eviscerates the general meaning of commercial purpose — thus impermissibly expanding the jurisdiction of Act 250. The term

"commercial," however, can have many different meanings depending on the context in which it is used. See 9 V.S.A. § 2351(15) (defining "commercial purpose" in context of motor vehicle financing as "a purpose related to the production, exhibition, marketing, transportation, processing or manufacture of goods or services by any person, where the cash price of the motor vehicle, exclusive of any finance charges, exceeds the sum of $20,000"); 10 V.S.A. § 1381(1) (defining "commercial establishment" in context of the Water Pollution Control Act to include charitable activities). In deciding Act 250 jurisdiction, we must view the term "commercial purpose" within the context of a land use statute, not as a tax statute or trade regulation. Viewing the language of Rule 2(L) in this context, "commercial purpose" refers to land use by multiple parties as a result of the developer's provision of facilities, goods or services. We are bound by the language of that definition as adopted by the Board and ratified by the Legislature, not by a general concept of a commercial purpose. Having followed the language of the definition within the spirit of a land use statute, we have not expanded the jurisdiction beyond the intent of the Legislature. See *In re Agency of Administration*, 141 Vt. 68, 76, 444 A.2d 1349, 1352 (1982) (although purpose of Act 250 is broad, it was not intended to reach all land use changes within state). Moreover, our holding does not empty the term "commercial" of any content in this context. A distinction remains, for example, between nonprofit commercial development and development for personal residential or recreational use.

The Foundation's arguments fail to consider the context of the case — jurisdiction for land use permits. The Foundation would treat a project funded by a wealthy philanthropist who does not directly benefit from the project differently from the same project funded by the people who use that project. While such distinctions may be critical for tax purposes or trade regulation, they are irrelevant in the context of a land use statute. The environmental impacts of a dormitory funded by third parties are exactly the same as the impacts of a dormitory funded by the people who use that dormitory. If, instead of building a residence hall for underprivileged children, the Foundation proposed building an incinerator or a factory for agricultural research, Act 250 jurisdiction would undoubtedly be less controversial. While we applaud the ultimate purpose of the Foundation's mission, we refuse to rely on inappropriate distinctions to create exceptions to Act 250 jurisdictional requirements.

*Affirmed.*

**Allen, C.J.,** concurring. I concur in the result because the building which the Foundation proposes to construct comes within the definition of "commercial dwelling" in Board Rule 2(M). It is intended to be occupied by humans, on an intermittent basis, and in exchange for contributions and/or donations. The legislative ratification of the rule requires that we enforce its plain meaning. I agree with the dissent that Rule 2(L) does not apply because the de facto exchange found to exist in *In re Baptist Fellowship of Randolph, Inc.*, 144 Vt. 636, 481 A.2d 1274 (1984), is not present here. According to the findings, the Foundation will construct the building using existing resources. The Foundation's goal is for its program to become self-supporting in the future through contributions. The construction of the facility by the Foundation is not in exchange for donations or contributions.

**Dooley, J.,** dissenting. Today, the majority has written the commercial purpose test out of Act 250, implementing the view that any major development should be subject to Act 250 jurisdiction. Since the law implemented by the majority opinion bears no relation to that enacted by the Legislature, I dissent.

The majority opinion is clearly at odds with the legislative intent and the words chosen to define Act 250 jurisdiction. The statute defines "development" to mean "construction of improvements on a tract or tracts of land . . . involving more than 10 acres of land . . . *for commercial or industrial purposes.*" 10 V.S.A. § 6001(3). By limiting development to that for commercial or industrial purposes, the Legislature made a conscious decision not to regulate all land use that has environmental impacts. We described that decision in *In re Agency of Administration*, 141 Vt. 68, 76, 444 A.2d 1349, 1352 (1982):

> [A]lthough the purposes of Act 250 are broad, the Legislature in passing the Act did not purport to reach all land use changes within the state, nor to impose the substantial administrative and financial burdens of the Act, or interfere with local control of land use decisions, except where values of state concern are implicated through large scale changes in land utilization. . . . The Act was a philosophic compromise between a desire to protect and control all the lands and environment of the State of Vermont, and the need to avoid an administrative nightmare. . . . The importance of this compromise aspect of the legislation to our decision here is well illustrated by the history behind the legislative definition of "development" now codified at 10 V.S.A. § 6001(3).

*Id.* (Citations omitted.)

Although we have never explored the reason for the legislative choice, the rationale for an identical choice in the Maine environmental law has been explained by the Maine Supreme Court:

> We think that the use of the word "commercial" was intended to describe the *motivation* for the development and not the type of activity to be performed on the property after it is developed. We consider that the Legislature chose to distinguish between commercial and non-commercial developments for a sound reason — it doubtless concluded that a greater need for supervision exists in the case of commercially motivated development where the dominant factor is the hope for profit than in a non-commercial development where land is being prepared for public enjoyment or divided for family distribution or for some other purpose than profit. In other words, commercial residential developments have a propensity for being big, concentrated and exhausting to the resources of the environment.

*In re Spring Valley Dev.*, 300 A.2d 736, 742 (Me. 1973). I have no doubt that the Vermont Legislature's rationale is similar. Act 250 is an environmental control law because the Legislature saw that certain land uses were "destructive to the environment and . . . not suitable to the demands and needs of the people of the state." 1969, No. 250 (Adj. Sess.), § 1 (statement of findings and declaration of intent). As in Maine, the Legislature drew a line that it thought would capture developments particularly "big, concentrated and exhausting to the resources of the environment" without using a more vague, discretionary and difficult-to-administer jurisdictional standard. It is our duty to protect and enforce this legislative choice.

Contrary to the majority's characterization, the term "commercial activity" has a clear, commonly accepted meaning in land use regulation. It denotes "any type of business or activity which is carried on for a profit." Black's Law Dictionary 270 (6th ed. 1990); see *Siegel v. City of Oakland*, 145 Cal. Rptr. 62, 67 (Ct. App. 1978) (term imports commerce, trade, business, industry or enterprise having financial profit as primary aim); *Roberts Enters., Inc. v. Secretary of Transp.*, 699 P.2d 479, 483 (Kan. 1985) (same); *Lanski v. Montealegre*, 104 N.W.2d 772, 774 (Mich. 1960) (in broad sense, commercial activity includes any type of business or activity carried on for profit); *Imbergamo v. Barclay*, 352 N.Y.S.2d 337, 341 (Sup. Ct. 1973) (term

"commercial" in zoning law denotes uses for profit); *Cordell v. Codington County*, 526 N.W.2d 115, 117 (S.D. 1994) (adopting the Black's Law Dictionary definition). We defined it in the context of commercial property in *Lewis v. Town of Brandon*, 132 Vt. 37, 42, 313 A.2d 673, 676 (1973): "The primary purpose of commercial property is to produce an income or profit for the owner." No one could conceive that the activity in this case would come even close to a commonsense definition of "commercial."

The majority's answer to the obvious mislabeling of petitioner's activity as commercial is that the Environmental Board has specially defined the word "commercial," and the Legislature has ratified that definition, in a way different from the normal definition. I agree that the definition in Environmental Board Rule 2(L) expands the definition beyond its normal limits, but cannot agree that the new definition has somehow created a license to further expand the definition to the point where it is defined by its antonym. This process reminds me of the children's game where a phrase is passed from person to person to compare its final version with that uttered originally. As here, the result is often a distortion of the original phrase, made possible by slight differences in restatement by persons who do not know what the original phrase was. Only if you do not know, or apply, the Legislature's term "commercial" can you reach a definition that includes this petitioner's activities within it.

I agree that the critical precedent is *In re Baptist Fellowship of Randolph, Inc.*, 144 Vt. 636, 481 A.2d 1274 (1984), where we held that the Rule 2(L) definition of "commercial purpose" is broad enough to encompass a nonprofit church development funded by church parishioners. *Id.* at 639, 481 A.2d at 1276. We agreed that the financial arrangement between the church and the parishioners had the exchange element of a commercial transaction because the parishioners were providing money to construct the church in order to use that facility and take part in the religious services provided within it. *Id.* Here, there is no exchange like that required in *Baptist Fellowship*. Only by holding that the elements found determinative in *Baptist Fellowship* are superfluous and unnecessary can we say that there is a commercial purpose here.

The alternative theory of exchange found by the majority is present in every charitable or nonprofit activity and results in the evisceration of any commonsense definition of "commercial." The majority holds that because persons who give to petitioner's charitable activities expect something charitable to be done with the money,

there is, therefore, an exchange of the donation for the charitable activities. Since no one who gives to a charity is uninterested in the beneficial purposes to which the charity is dedicated, all charitable giving fits within the majority's exchange rationale. The result of this distorted application of an exchange is that a term which is associated with profit-making activity is now defined to include *all* activity conducted on a not-for-profit basis.

As the majority states, we must defer to the Board's interpretation of the Act and its rules, absent compelling indication of error. On the other hand, the Board "may not use its rule-making authority to enlarge a restrictive grant of jurisdiction from the legislature." *In re Agency of Admin.*, 141 Vt. at 76, 444 A.2d at 1352. I can think of no greater indication of error than that the Board turns a word restricting its jurisdiction into its opposite in order to establish jurisdiction. After today's decision, the word "commercial" is effectively deleted from the statute. I dissent.