STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
|---|---|
| | Docket No. 96-8-16 Vtec |

| | |
|---|---|
| Laberge Shooting Range JO | DECISION ON THE MERITS |

The dispute before the Court is not new. As early as 1991, if not earlier, parties have been embroiled over a shooting range on the Laberge farm in Charlotte, Vermont.

This action is an appeal from an August 2, 2016 Natural Resources Board (NRB) Reconsideration Decision affirming the District #4 Coordinator's February 12, 2016, Jurisdictional Opinion that the shooting range (the Range) in Charlotte is subject to Act 250 jurisdiction.[1] The appeal is brought by Laberge & Sons, Inc. (Laberge), which seeks to reverse the conclusion that the Range has triggered Act 250 jurisdiction and therefore needs an Act 250 Permit. Opposing Laberge is the Firing Range Neighborhood Group, LLC, (the Neighborhood Group), which supports the conclusion that the shooting range has triggered Act 250 jurisdiction. The NRB is also participating in this matter.

**Procedural History**

Laberge filed its Amended Statement of Questions on November 10, 2016. In a January 4, 2017 decision we granted Laberge's motion to amend the Statement of Questions but rejected the inclusion of Amended Question 9. In an August 15, 2017 decision we granted the Neighborhood Group summary judgment on Amended Question 7. The remaining issues are therefore framed by Amended Questions 1–6 and 8.

This matter was further narrowed by the parties' stipulation to bifurcate the case for trial, which was entered as an order by the Court on October 3, 2017. In that stipulation the parties agreed to first address two issues in a trial: (a) whether the Range's acceptance of donations constitutes a change in use triggering Act 250 jurisdiction, and (b) whether the construction,

---

[1] The August 2, 2016 decision is titled "Reconsideration Decision – Altered;" it was issued after a prior decision solely to correct the number of the jurisdictional opinion.

repair, and relocation of shooting benches and construction of berms at the Range were for safety purposes and exempt from Act 250 review.

The Court held a trial on January 31, 2018 at the Costello Courthouse in Burlington, Vermont. At the parties' direction, the Court did not conduct a site visit. Appearing at trial were Laberge and its lawyer Hans G. Huessy, Esq., the Neighborhood Group and its lawyer Justin B. Barnard, Esq., and the NRB and its lawyer Gregory Boulbol, Esq.

Based upon the evidence presented at trial, the Court renders the following Findings of Fact and Conclusions of Law. This decision focuses solely on the first issue: whether the Range's acceptance of donations constitutes a change in use triggering Act 250 jurisdiction. As our conclusion determines the outcome of this matter, all other remaining issues are moot.

### Findings of Fact[2]

**The 1995 Jurisdictional Opinion**

1. In 1994, a group of neighbors sought an Act 250 advisory opinion (now titled Jurisdictional Opinion) relating to the Range and a gravel pit operation conducted by Laberge.

2. The District #4 Coordinator (District Coordinator) requested information from Laberge to assist in the jurisdictional determination.

3. Laberge's lawyer provided a January 5, 1995 letter to the District Coordinator in response to the Coordinator's request. The letter states that Laberge does not charge fees for use of the Range. The letter notes that the neighbors suggested the Range was a commercial operation in part because a donation box had been prominently displayed at the entrance to the Range for a number of years. The letter states that the donation box was put up in 1992 as a temporary measure to contribute to legal fees arising from challenges to the use of the property.

4. On April 14, 1995, the District Coordinator issued Jurisdictional Opinion #4-113 (the 1995 JO), concluding that the Range was not subject to Act 250 jurisdiction.

5. The 1995 JO lists the sources of information it is based on. In relevant part, the list includes the Laberge lawyer's January 5, 1995 letter, the District Coordinator's meeting with the

---

[2] We note that the majority of the evidence in this matter was provided through exhibits admitted by stipulation at the outset of trial. The Court did not have the benefit of reviewing this evidence in advance of or during trial, and, because of this, was unable to ask questions to solicit additional evidence to aid this decision.

neighbors in December 1994, the District Coordinator's site visit to the Range in March 1995, and other sources of information.

6.      The 1995 JO concludes that while the construction of shooting benches in the 1950s was an improvement, it was not an improvement made for a commercial purpose because there was "no evidence that the use of the shooting range was or has ever been associated with payment of a purchase price, fee, contribution, donation, or other object having value."

7.      The 1995 JO adds that according to Louis Laberge, a representative of Laberge, "the use of the range has always been by permission only and no fees have ever been charged for personal use, for training purposes, or for competitions."

8.      Because the use of the Range did not meet the definition of commercial purpose, the 1995 JO concludes that the Range was neither a pre-existing development, nor a development at the time the 1995 JO was issued.

9.      The 1995 JO includes a certificate of service certifying that copies of the opinion were sent to specific people.

**Testimony of Amie Laberge**

10.     Amie Laberge's family owns the farm on which the Range is located.

11.     Mr. Laberge described the Range as being situated on the farm, and indicated that it is adjacent to or part of the pasture used by the farm to graze cows.

12.     Mr. Laberge testified at trial that the Range has received in-kind donations of labor and materials for many years, although he was unsure exactly how far back such donations went.  He pointed to donations by Rice Lumber as an example of historic in-kind donations.

13.     The Range began to receive cash donations when Laberge's legal problems first began. This appears to have been in the early 1990s, when neighbors first requested an Act 250 jurisdictional opinion.[3]

14.     The Range continues to receive cash donations.  These donations are received via a donation box at the entrance to the range.  According to Mr. Laberge, a sign at the box states

---

[3] The January 5, 1995 letter from the Laberge's attorney refers to a November 21, 1991 advisory opinion by the same District Coordinator who issued the 1995 JO.  According to the letter, the 1991 opinion concluded that the use of the Laberge property at that time did not require an Act 250 permit.

"donations are appreciated," or "if you chose to donate you may, if you don't want to you don't have to."[4]

15.     Cash donations are received from individuals, from some (but not all) of the police departments that use the Range, and possibly from the UVM shooting team.

16.     Laberge does not keep records of cash or in-kind donations. Mr. Laberge recalls only a single instance where Laberge gave a receipt for a donation.

17.     An exhibit introduced at trial indicates that $47,062.70 in cash donations to the Range was deposited into the Laberge bank account from May 2014 to November 2016.

18.     The Laberges have never bought materials for the Range, and Mr. Laberge does not recall ever using the donation money to pay anyone to do work on the Range.

19.     The Laberges never requested or required cash donations in exchange for use of the Range.

20.     Cash donations are used primarily to pay legal fees, but have also been used to pay for property taxes and insurance. It is unclear what portion of the farm's property taxes and insurance are paid with donation money, or how frequently this has been done.

21.     Mr. Laberge testified, unequivocally, that the Laberge's would continue operating the Range if they stopped accpeting donations.

**Deposition of Dennis Breitigan and Exhibits**

22.     Dennis Breitigan began shooting at the Range in the late 1990s or early 2000s.

23.     In or around 2012, Mr. Breitigan attended the annual clean-up at the Range. Seeing that some of the shooting benches were in an advanced state of disrepair, Mr. Breitigan, with the help of others, replaced two shooting benches and repaired a third at the clean-up.

24.     Mr. Breitigan and the others did this on their own initiative to make the benches safer and more durable. No one asked or instructed them to repair or replace the benches. Mr. Breitigan provided the tools and the materials, which were left over from his construction company. Mr. Breitigan was not paid.

---

[4] The request for a jurisdictional opinion submitted by the Neighborhood Group in late 2015 purports to show a photograph of the sign, which reads in part "Donate Here."

25. Mr. Breitigan noted that there is a gate at the entrance to the Range because there are cows on the Range from time to time.

**Deposition of Jay Carroll**

26. Jay Carroll is the vice president of Rice Lumber, where he has worked full time since 1981 (and summers before that).

27. Mr. Carroll and his father were friends with the Laberges since at least the 1970s. Mr. Carroll began shooting at the Range, along with his brother and father, in the mid to late 1970s.

28. Louis Laberge was friends with Mr. Carroll's father, and would periodically ask for donations of lumber.

29. Every year or two since at least 1981, Rice Lumber would donate scrap lumber to the Range. Mr. Carroll estimated that each donation would fit into a pickup truck and would have been worth about $75. The Laberges and volunteers used the donated lumber, mostly 2 x 4s and plywood, to build shooting frames for targets.

30. In the late 1980s or early 1990s, Rice Lumber donated some plywood to local carpenters to replace existing shooting benches at the Range.

31. Mr. Carroll recalled another one-time donation of material worth less than $400–$500, which Louis Laberge used to build a roof over one of the shooting benches. He assumes that Rice Lumber made other donations to the Range, but does not specifically recall any.

32. The Boy Scouts, local food shelves, and others also solicited and received in-kind donations from Rice Lumber.

33. The Laberges organized an annual clean-up where volunteers would help clean up trash and litter from those using the Range. Louis Laberge asked Mr. Carroll to participate in these events, but Mr. Carroll did not do so because he did not have time.

34. Mr. Carroll has never donated cash to the Range.

**Affidavit of Kevin McLaughlin**

35. Kevin McLaughlin is the Sheriff of the Chittenden County Sheriff's Department.

36. Officers in the Department used the Range to qualify for firearms certification from before 2008 to 2014.

5

37.     Sheriff McLaughlin authorized "payments" to the Range of $200 per year from 2008 to 2014. Sheriff McLaughlin describes these "payments" as being made "in consideration for the Department's use of the Range."

38.     The Chittenden County Sheriff's Department has never received an invoice, bill, or request for payment or donation from the Laberges.

**Conclusions of Law**

I.      **Legal Standards**

        a. **Commercial Purpose**

Act 250 requires a permit prior to commencement of construction of certain developments. 10 V.S.A. § 6081(a). The Act defines "development" as:

> The construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land within a radius of five miles of any point on any involved land, for commercial or industrial purposes in a municipality that has adopted permanent zoning and subdivision bylaws.

10 V.S.A. § 6001(3)(A)(i).

The parties in this matter have focused on whether Laberge has undertaken construction of non-exempt improvements, and whether the Range is operated for a commercial purpose. As noted above, we focus here on the question of commercial purpose.

Act 250 Rules define commercial purpose as "the provision of facilities, goods or services by a person other than for a municipal or state purpose to others in exchange for payment of a purchase price, fee, contribution, donation or other object or service having value." Act 250 Rule 2(C)(4). Our Supreme Court has explained that this Rule includes the following elements: "(1) the provision of facilities, goods or services, (2) by a person, (3) other than for a municipal or state purpose, (4) to others, (5) in exchange for, (6) payments of a purchase price, fee, contribution, donation or other object having value." In re Spring Brook Farm Found., 164 Vt. 282, 286 (1995).[5]

The issue raised in this matter is whether use of the Range, and the receipt of in-kind and cash donations, meets the exchange element. Where "payment" is in the form of donations or contributions, as here, the exchange element is met if the subject of the jurisdictional opinion "could not provide the facilities and services . . . unless it received the contributions and

_____

[5] These elements are based on an earlier, identical version of Act 250 Rule 2(C)(4).

donations . . . ." In re Baptist Fellowship of Randolph, Inc., 144 Vt. 636, 639 (1984).  This holds true even for indirect exchanges—i.e. where one party donates to the subject of the jurisdictional opinion, and that subject then uses the donations to provide a service or facility to a third party. Spring Brook Farm, 164 Vt. at 286–87.

### b.  The preclusive effect of the 1995 JO

In this matter we must consider the 1995 JO, its conclusions and the facts that the conclusions are based on, and its binding nature.

The 1995 JO concluded that the Range did not have a commercial purpose historically, and did not have a commercial purpose when the JO was issued on April 14, 1995.  The 1995 JO is final and binding as to the facts on which it is based.  10 V.S.A. § 6007(c); In re Catamount Slate, Inc., 2004 VT 14, ¶ 20, 176 Vt. 284; WhistlePig, LLC Act 250 JO (#9-070), No. 21-2-13 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Apr. 11, 2014) (Durkin, J.) (citation omitted).[6]

We therefore focus our analysis on whether there is evidence of changes in the Range operations since the 1995 JO that would justify altering the conclusion that the Range is not used for a commercial purpose, and therefore not subject to Act 250 jurisdiction, or, alternatively, whether facts that were not presented to the District Coordinator who drafted the 1995 JO show a commercial purpose.

### c.  Burden of Proof

The burden of proving that Act 250 jurisdiction extends to a given development "is on the party that claims that jurisdiction should attach."  Re: Vermont RSA Ltd. P'ship d/b/a/ Verizon Wireless, No. 441, slip op. at 5 (Vt. Envtl. Bd. Oct. 20, 2005), *aff'd sub nom.* In re Vermont RSA Ltd. P'ship, 2007 VT 23, 181 Vt. 589 (citations omitted).  This includes the burden of production and the burden of proof, or persuasion.  Id. (citations omitted).

Here, the burden is on the Neighborhood Group to produce evidence and prove that either (1) a change in the use of the Range since the 1995 JO was issued creates a commercial

---

[6] The Permit Reform Act of 2004 amended 10 V.S.A. § 6007(c) to require that a jurisdictional opinion be published in order for it to become a final determination.  2003, Adj. Sess., No. 115, § 47; WhistlePig, LLC Act 250 JO (#9-070), No. 21-2-13 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Apr. 11, 2014) (Durkin, J.).  The 1995 JO predates this amendment, and thus was not subject to this requirement.  The JO includes a certificate of service with a list of interested parties on which it was served.  It therefore appears to be a final determination.

purpose where none existed before, or (2) evidence not presented to the District Coordinator who issued the 1995 JO shows the Range is used for a commercial purpose.

## II.     Discussion

### a.  Whether there has been a change in the use of the Range since the 1995 JO was issued that creates a commercial purpose where none existed before

The Neighborhood Group argues, generally, that Laberge's acceptance of donations satisfies the exchange element of the commercial purpose test.

This argument ignores the preclusive effect of the 1995 JO.  In April 1995, when the 1995 JO was issued, the Range had maintained a box for cash donations for two or three years.  While the 1995 JO does not specifically mention the cash donations, the letter from Laberge's attorney expressly describes the donation box, and the 1995 JO acknowledges that this letter was considered in forming the opinion.  The 1995 JO also states that the District Coordinator met with the neighbors and visited the Range prior to issuing the JO.  We therefore infer the District Coordinator knew that Laberge was receiving cash donations prior to 1995, and thus, donations were part of the factual basis of the JO.

With this information, the 1995 JO concludes that there was no evidence that the use of the Range "was or has ever been associated with payment of a purchase price, fee, contribution, donation, or other object having value."   Under the 1995 JO, the cash donations did not satisfy the exchange element.  Laberge has continued to receive cash donations for the Range since the 1995 JO was issued.  Because of the preclusive effect of the 1995 JO, the fact that there are cash donations does not in itself prove the exchange element.

In order to show that the cash donations now satisfy the exchange element, where they did not do so before, the Neighborhood Group must show a change in the way cash donations are received or used.

### i.  Whether cash donations are now received in exchange for use of the Range

The evidence before the Court shows that donations are not and were not required to use the Range.  The cash donation box at the Range indicates that donations are not mandatory.  The sign at the box simply reads "Donate here."   Donations are not requested, required or

solicited by this sign or by other means. While many police departments use the Range, some give donations but others do not. Additionally, as discussed below, there is evidence that funds provided by at least one police department were not requested. Further, Mr. Carroll has used the Range for decades even though he never donated cash. This demonstrates that cash donations are not required. There is also evidence, discussed below, that in-kind donations were not, and are not, mandatory, but instead on the donee's own initiative.

The Neighborhood Group presents Sheriff McLaughlin's affidavit and argues that donations to the Range are now given in exchange for use. In effect, the Neighborhood Group argues that "donations" to the Range are not actually donations, because they are mandatory. See Baptist Fellowship, 144 Vt. at 639 (explaining that the terms "donation" and "contribution" "connote the act of giving; a person cannot be required to give a donation in exchange for some consideration since by its very definition a gift is a voluntary transfer without consideration.") (citing Williamson v. Johnson, 62 Vt. 378, 380–81 (1890)).

According to the Sheriff McLaughlin's affidavit, he authorized "payments" to the Range of $200 per year from 2008 to 2014. Sheriff McLaughlin describes these "payments" as being made "in consideration for the Department's use of the Range." Importantly, the affidavit also states "the Department has never received an invoice, bill, *or request for payment* from the Range." (emphasis added).[7]

We are unable to conclude from Sheriff McLaughlin's affidavit that donations to the Range are payments in exchange for use. It is clear from the totality of evidence that the Laberges have never required donations for use from any other party, individual or organization, using the shooting range. Furthermore, regardless of how the Sheriff intended to use the term, we cannot characterize the interaction between Laberge and the Sheriff based solely on the understanding of one party to the interaction, because there would not have been a "meeting of the minds." See Restatement (Second) of Contracts §§ 3, 17 (1981); Spring Brook Farm, 164 Vt. at 288 (applying contract law principles to determine whether exchange element is met). This is further supported by Mr. Laberge's testimony in with he included the Department in the list of

---

[7] Sheriff McLaughlin did not testify at trial, and therefore he was not examined, cross-examined, or available to answer questions from the Court.

organizations from which the Range has received cash donations. Sheriff McLaughlin may have justified using part of the Department's budget to donate the Range because the Department had used it, however, the payment was not required.

We conclude that the Neighborhood Group fails to meet its burden of proof showing that the central nature of cash donations to the Range has changed since the 1995 JO.

### ii. Whether there was an increase in cash donations since 1995, and whether an increase would satisfy the exchange element

The Neighborhood Group argues that an increase in the amount of cash donations in recent years has changed the use to commercial. While we have evidence of the amount of cash donations from May 2014 to November 2016, we have no evidence on the amount of cash donations received prior to this period. We therefore have no evidence of an increase since the issuance of the 1995 JO.

Furthermore, even if we did have such evidence, an increase in donations in and of itself would not be germane to determining whether the exchange element is met for the purposes of the commercial purpose analysis. Again, the critical question is whether Laberge "could not provide the facilities and services . . . unless it received the contributions and donations . . . ." Baptist Fellowship, 144 Vt. at 639.

The donations here have been used to cover legal fees and, in fact, began in response to litigation regarding the Range. We do not consider these expenses to be a part of Range operations for the purpose of determining Act 250 jurisdiction, because they are only abstractly tied to the use in question. See Spring Brook, 164 Vt. at 287 (jurisdictional analysis should focus on the impact of the land use). If we were to consider legal fees as part of the use, then any activity that is not commercial could be made commercial by engaging it in litigation.

At some point in time donations were used to pay property taxes and for insurance for the Laberge farm as a whole. We have not received evidence of how much or how frequently donations have been used in this manner. The Court does have evidence, however, that even in the absence of receiving donations, the Range would continue to operate. Therefore, the use of donations for tax and insurance purposes will not make the Range purpose commercial, as the

Range can provide the facility and service without the receipt of donations.  See Baptist Fellowship, 144 Vt. at 639.

We have no evidence on the amount of cash donations prior to or at the time of the 1995 JO.  We have no evidence on the amount of legal fees over the years.  We have no evidence on the amount and frequency donations were used for tax or insurance purposes.  We therefore conclude that the Neighborhood Group fails to meet its burden of proof showing that there was an increase in cash donations to the Range since the 1995 JO or that any increase satisfies the exchange element.

### iii. Whether the receipt and use of donations has become indispensable to the Range's operation

The Neighborhood Group also offers that cash donations have become indispensable to the Range since the 1995 JO was issued.  The Neighborhood Group has not presented evidence, however, to show that the Range has relied on donations or contributions to operate since the 1995 JO was issued.

As noted above, to satisfy the exchange element there must be a causal, but-for connection between the donations or contributions received and the services or facilities provided.  Baptist Fellowship, 144 Vt. at 639 (finding a commercial purpose where, even though "none of the Church's parishioners were required to make a payment in exchange for using the Church's facilities," the Church would not be able to provide facilities and services without donations).

Amie Laberge unequivocally testified that Laberge does not rely on donations to make the Range available, and that Laberge would continue to operate the Range without donations.

The minimal nature of Range infrastructure lends further credibility to this assertion.  The infrastructure includes shooting frames made from about $75 worth of materials which are replaced every year or two, and a handful of shooting benches that can be built in a day with leftover materials.  The benches can last for years or decades without maintenance.  The frames and benches can be replaced at minimal cost to Laberge without donations, or can go unreplaced at no cost (as they have done in the past).

11

The burden of maintaining this minimal infrastructure is a far cry from cases where cash donations were essential to carry out the use in question, such as building and maintaining "a dormitory/residence hall," Spring Brook, 164 Vt. at 283, or a "36' by 80' two story church," Baptist Fellowship, 144 Vt. at 637.

We conclude that the Neighborhood Group fails to meet its burden of proof showing that cash donations are necessary for the Range to operate.

### iv. Conclusion

For the above reasons, we conclude that the Neighborhood Group fails to meet its burden of proof in showing there has been a change in donations to the Range since the 1995 JO was issued that would create a commercial purpose where none existed before.

### b. Whether evidence that was not presented to the District Coordinator who issued the 1995 JO now shows the Range is or has been used for a commercial purpose

### i. Whether in-kind donations satisfy the exchange element

The Neighborhood Group notes that there is no evidence that the District Coordinator was aware that Laberge received in-kind donations of labor and materials at the time the 1995 JO was issued.

In April 1995, when the 1995 JO was issued, the Range had been receiving in-kind donations of labor and materials for years or decades. For example, Rice Lumber had been donating materials since at least 1981. While we do not know exactly what information on this issue was presented to the District Coordinator who issued the 1995 JO, there is no clear evidence that he was aware of in-kind donations to the Range. As such, the 1995 JO would not have any binding effect on this issue. We conclude, however, that the in-kind donations do not satisfy the exchange element.

First, there is evidence that Range users did not have to give in-kind donations. For example, Mr. Breitigan voluntarily attended the clean-up and donated his time and materials to constructing the new shooting benches, as he determined the old benches were badly deteriorated. He was not asked to do so, and there is no indication that his in-kind donations were required or considered in any way to be an exchange for using the Range. Mr. Carroll likewise was involved in donating materials through Rice Lumber, but there was no suggestion

12

that these donations were required for him or others from Rice Lumber to use the Range. Mr. Carroll also expressly declined to participate in the annual clean-up when asked by the Laberges, and nevertheless continued to use the Range.

Second, the in-kind donations of both materials and labor are sufficiently minimal such that their bare existence does not prove that the Range could not operate without them.

There is evidence that the Laberge family worked on the Range infrastructure, which shows that the volunteer labor may not be necessary to construct the shooting frames and benches. Also, the in-kind materials have been inexpensive, adding up to $75 every year or two, with some more expensive materials every decade or two to repair or replace shooting benches. Amie Laberge testified that the Range would continue to operate without donations, either cash or in-kind. We find it credible that Laberge would be able to afford to replace materials even without donations.

Furthermore, while the shooting frames and benches make the Range better, the evidence suggests that they are not essential to the Range. There is no evidence that the Range could not operate without the frames and benches. In fact, the evidence shows that the Range has operated in the past after the benches were badly deteriorated.

Again, the benches, frames, and annual clean-up here are a far cry from the "dormitory/residence hall" in Spring Brook, 164 Vt. at 283, or the "36' by 80' two story church" in Baptist Fellowship, 144 Vt. at 637. In those cases, the structures were essential to the use in question, and could not have been built without donations.

For these reasons, we conclude the Neighborhood Group fails to meet its burden of proof showing that Laberge would not be able to operate the Range without the in-kind donations of labor and materials, and the in-kind donations therefore fail to satisfy the exchange element.

### ii. Whether the use of cash donations for taxes and insurance meets the exchange element

The Neighborhood Group also points out that according to the Laberge attorney's January 5, 1995 letter to the District Coordinator, donations were used to defray legal fees. The 1995 JO does not state that this money was used to pay property taxes or insurance premiums. Amie Laberge testified in the 2018 merits hearing, however, that while donations have been used

primarily for legal fees, they have also been used to pay property taxes and insurance premiums for the farm.

If the donations were used to pay property taxes and insurance to a degree that the Range would not have been able to operate without it, then the exchange element might be met. The Neighborhood Group has not, however, introduced facts that would support this conclusion. As noted above, we do not have evidence of how much of the donations were used to pay property tax or insurance premiums, how often donations were used for this purpose, or whether donations paid a portion or all of these expenses. Lastly, there is no evidence regarding whether donations paid towards property taxes and insurance covered any significant part of the farm's overall tax and insurance costs.

There is, however, evidence that the farm and Range do not rely on donations to make these payments. First, Amie Laberge testified that the donation money is primarily used for legal fees. Second, Amie Laberge testified that they would continue to operate the Range without donations. In addition to the reasons noted above, we find this credible, particularly because the Range is located on, and part of, a large farm. The land where the Range is situated is used as part of the farm to pasture cows. Laberge would have to continue paying property taxes and insurance on this part of the farm regardless of whether the Range is in operation.

The Neighborhood Group has failed to prove that Laberge would not be able to operate the Range without using some of the donations to pay property taxes and insurance. In fact, the evidence shows that the Range has operated without donations paying these expenses in the past.

### Conclusion

The evidence introduced at trial does not show that the Range is made available to its users "in exchange for" donations or any other thing of value. The Neighborhood Group fails to meet its burden of proof that Act 250 jurisdiction attached to the Range. In particular, the evidence does not show that either (1) there has been a change in the use of the Range since the 1995 JO was issued that would create a commercial purpose where none existed before, or (2) evidence not presented to the District Coordinator who issued the 1995 JO shows the Range is used for a commercial purpose.

14

For these reasons, we conclude that the Range does not have a commercial purpose, and does not need an Act 250 permit. Having reached this conclusion, all remaining issues in this appeal are moot.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.

Electronically signed on March 9, 2018 at 1:30 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division