ROBINSON, J., dissenting.
¶ 37. The majority has concluded that a facility that is open seven days a week, for ten to eleven hours per day, yielding nearly $20,000 per year in donation revenue does not operate for a "commercial purpose" because the revenue is not essential to sustain the enterprise indefinitely. In reaching this conclusion, the majority attributes to one precedent, In re Baptist Fellowship of Randolph, Inc., 144 Vt. 636, 481 A.2d 1274 (1984), a holding that decision does not espouse; ignores or explains away the reasoning reflected in another more recent precedent, *552 In re Spring Brook Farm Found., Inc., 164 Vt. 282, 671 A.2d 315 (1995) ; and relies on a policy analysis that doesn't make sense in light of the purposes of the statute we are construing. For these reasons, and because I believe the new rule articulated by the majority will have unfortunate ramifications inconsistent with the Legislature's intent, I respectfully dissent.
¶ 38. Baptist Fellowship clearly establishes that voluntary donations, not required as a condition of use, can give rise to a commercial purpose, but does not support the majority's conclusion that voluntary donations to an entity only support a finding that it has a "commercial purpose" when those donations are essential to financially sustain the entity.
¶ 39. In Baptist Fellowship, this Court rejected the argument that an entity funded by voluntary contributions does not meet the definition of "commercial purpose." 144 Vt. at 639, 481 A.2d at 1276. The church argued that because a "commercial purpose" is defined by the applicable regulations as "the provision of facilities, goods or services by a person ... to others in exchange for payment of a purchase price, fee, contribution, donation or other object having value," an entity that does not charge its patrons for services, but instead relies on voluntary contributions, does not have a commercial purpose. Id. at 638, 481 A.2d at 1275 (quotation omitted). We noted that the church's construction "impermissibly render[s] the terms 'contribution' and 'donation' superfluous," since, by definition, donations are voluntary transfers without consideration. Id. at 639, 481 A.2d at 1276. Accordingly, we held that voluntary contributions that were effectively in exchange for facilities or services satisfied the "commercial purpose" definition. Id.
¶ 40. This Court did not, in Baptist Fellowship, adopt a requirement that the donations be necessary to sustain the church. We quoted the trial court's conclusion that "[w]hile there is no quid pro quo exchange involved, it is clear that the Church could not provide the facilities and services to its members unless it received the contributions and donations from its members" and then summarized, "In other words, there is a de facto exchange of the Church's facilities and services for donations and contributions." Id. We concluded, "This de facto interpretation of the 'in exchange for' wording of Rule 2(L) appears to us to be in keeping with both the purpose and spirit of Act 250." Id. The conclusion this Court embraced was that an implicit exchange of value, resting on voluntary donations rather than assessed charges, met the "commercial purpose" definition. Nothing in the Court's reasoning supports the inference that the fact that the church relied on the donations for its continued survival was necessary to its holding.
¶ 41. In fact, the Court's discussion of the purpose of Act 250 is at odds with the suggestion that the church's reliance on the donations was essential to a determination that it had a "commercial purpose." Had the church held a sufficiently robust endowment to fund its operations in perpetuity, its receipt of donations would still have signaled a commercial purpose, triggering Act 250 jurisdiction. As the Court noted, "Act 250 speaks to land use and not to the particular institutional activity associated with that land use; to exclude a church from the provisions of Act 250 simply because of its evangelical services could not be justified on environmental grounds." Id. Likewise, to exclude a church that receives donations as an implicit exchange for its services and facilities when the church does not require those donations to support its operations could not be justified on environmental grounds.
*553 ¶ 42. This Court's discussion of the "commercial purpose" definition in Spring Brook Farm reinforces that it is the contribution of substantial value in exchange for services, not the reliance of the recipient on the contributions to sustain its operations, that satisfies the "commercial purpose" prong. In Spring Brook Farm, a not-for-profit foundation dedicated to providing inner-city children with the opportunity to visit a working farm sought to build a residence hall to house children and their teachers. A philanthropic family provided the initial funding for the project, although the intent was to solicit charitable donations from the general public and business community to enable the project to become self-supporting. The foundation would not accept payments or funds from the students, parents, or schools involved in the program. The narrow holding of the case was "that the exchange element of the commercial purpose test for determining Act 250 jurisdiction incorporates projects where a third person pays the provider of the facility goods or services for the benefit of another." Spring Brook Farm, 164 Vt. at 283, 671 A.2d at 316 (citation omitted). The analysis underlying that holding is instructive in that the Court's identification of the specific elements in the definition of "commercial purpose," as well as its discussion of the purpose of the Act and its impact on the Court's understanding of the "commercial purpose" requirement both reinforce that an entity that receives substantial voluntary contributions, essentially in exchange for its services, has a commercial purpose, without regard to whether the entity relies on those contributions for its sustenance.
¶ 43. In a detailed analysis of the meaning of "commercial purpose," the Court concluded that the plain language of the "commercial purpose" definition in the applicable rule encompasses the following elements:
(1) the provision of facilities, goods or services, (2) by a person, (3) other than for a municipal or state purpose, (4) to others, (5) in exchange for, (6) payments of a purchase price, fee, contribution, donation or other object having value.
Id. at 286, 671 A.2d at 318. In parsing the definition at its most granular level, we said nothing suggesting that the contributions of value must be necessary to sustain the entity proposing a development. In concluding that all of these elements were satisfied, the Court said nothing about the reliance of the foundation on donations to support the endeavor; instead, we simply noted, "The classroom/residence hall is provided by the Foundation (not for municipal or state purposes) to underprivileged children in exchange for donations and contributions." Id. Those were the operative facts that supported the Court's conclusion.
¶ 44. The majority minimizes the significance of the Court's statutory parsing, suggesting that the decision merely paraphrased the requirements of Rule 2(C)(4)'s definition of "commercial purpose" and otherwise left in place the prior interpretation of the "in exchange for" requirement that the majority attributes to the Baptist Fellowship decision. Setting aside my disagreement with the majority's read of Baptist Fellowship, it's hard to imagine that if the necessary-to-sustain-the-operations requirement really existed, this Court would not have acknowledged that in the most expansive and detailed consideration of the "commercial purpose" definition it has provided to date. Moreover, there is no indication in Spring Brook Farm that the Court applied this unwritten requirement to the facts in the case; the decision includes no discussion about whether the foundation could or would continue to operate the facility in the absence of the hoped-for public contributions.
*554 If this was an essential element of the analysis, the Court would have addressed it, especially given that the hoped-for future contributions to sustain the enterprise were only aspirational at the time.
¶ 45. The Court's discussion in Spring Brook Farm of the purposes of Act 250, and its response to the suggestion that its application of the "commercial purpose" definition improperly expands Act 250 jurisdiction, reinforces this conclusion. I quote it at length because it is germane to the issues in this case:
The term "commercial," however, can have many different meanings depending on the context in which it is used. In deciding Act 250 jurisdiction, we must view the term "commercial purpose" within the context of a land use statute, not as a tax statute or trade regulation. Viewing the language of Rule 2(L) in this context, "commercial purpose" refers to land use by multiple parties as a result of the developer's provision of facilities, goods or services. We are bound by the language of that definition as adopted by the Board and ratified by the Legislature, not by a general concept of a commercial purpose. Having followed the language of the definition within the spirit of a land use statute, we have not expanded the jurisdiction beyond the intent of the Legislature. Moreover, our holding does not empty the term "commercial" of any content in this context. A distinction remains, for example, between nonprofit commercial development and development for personal residential or recreational use.
The Foundation's arguments fail to consider the context of the case-jurisdiction for land use permits. The Foundation would treat a project funded by a wealthy philanthropist who does not directly benefit from the project differently from the same project funded by the people who use that project. While such distinctions may be critical for tax purposes or trade regulation, they are irrelevant in the context of a land use statute. The environmental impacts of a dormitory funded by third parties are exactly the same as the impacts of a dormitory funded by the people who use that dormitory. If, instead of building a residence hall for underprivileged children, the Foundation proposed building an incinerator or a factory for agricultural research, Act 250 jurisdiction would undoubtedly be less controversial. While we applaud the ultimate purpose of the Foundation's mission, we refuse to rely on inappropriate distinctions to create exceptions to Act 250 jurisdictional requirements.
Id. at 288-89, 671 A.2d at 319-20 (citations omitted).
¶ 46. Much of the above discussion is illuminating in this case: the Court's insistence that the focus is on the impacts of the development, and not on the balance sheet of the entity doing the development; our recognition that the concept of "commercial purpose" from a tax or financial perspective may be different from a land-use perspective; our conclusion that the Legislature intended "commercial purpose" to relate to "land use by multiple parties as a result of the developer's provision of facilities, goods or services"; and the recognition that a worthy and even generous use of land is not inconsistent with a "commercial purpose" for Act 250 purposes. These observations all reinforce the district commission's and Natural Resources Board's determinations in this case. The majority ignores or dismisses this discussion, citing the dissent in Spring BrookFarm as evidence that "[a]lternative understandings of the commercial purpose requirement's function ... abound." Ante, ¶ 32. But this discussion reinforces and *555 sheds light on the Court's holding in Spring Brook Farm-a holding that, for the reasons noted above, is inconsistent with the majority's position here.
¶ 47. Finally, both the goals of Act 250 and sound policy considerations weigh against the majority's position, and in favor of maintaining the Spring Brook Farm rule. The majority is correct that Act 250 does not purport to apply to all development across the board, but instead seeks to draw a line between that development that requires review and a permit, and that development that remains unregulated by that law. I don't take issue with that reality. But the balance the majority seeks to strike is hard to square with the purpose (or various purposes) of the statute; it shifts the focus from the nature of a developer's operations to its internal finances, rests on a distinction that has no bearing on the regulatory goals of Act 250, leads to incongruous results, and minimizes the relevance of the amounts of the contributions paid in connection with the use of a facility. The Spring Brook Farm assessment, which considers whether the developer receives substantial value in exchange for its goods, services, or facilities, better aligns with the goals of Act 250 and reasonable policy.
¶ 48. Because it posits that the applicability of Act 250 hinges on the extent to which an entity relies on voluntary contributions for its sustenance, the majority's approach requires intrusive and irrelevant exploration of an entity's internal finances, shifting the focus away from the environmental impacts of the activity. Whether an entity that makes its facilities available to the public in implicit exchange for voluntary contributions (by someone-not necessarily the direct beneficiaries) is financially dependent on those contributions has little to no bearing on any relevant consideration for Act 250 purposes. Yet the majority's approach makes discovery and litigation about such an entity's internal finances inevitable, despite its irrelevance to the goals of Act 250.
¶ 49. This kind of inquiry will inevitably lead to incongruous results. A property owner offering use of facilities to the public in implicit exchange for voluntary contributions whose operations entail low overhead costs, or who is independently wealthy, is likely to fall outside the "commercial purpose" definition, but one who has higher overhead costs, or who is not as wealthy or philanthropic, will not-even if the activities are essentially the same. I realize that any line will lead to some outcomes that are hard to square; if Laberge in this case stopped accepting donations the impacts of public use of the facilities would not diminish and might even rise. But it makes little sense that, in the context of significant revenue-generating activities, the application of the "commercial purpose" label depends on the balance sheet, wealth, or generosity of the operator.
¶ 50. Perhaps most importantly, the majority's analysis renders the amount of the revenues an enterprise derives from its facilities, goods, or services, to a minimally relevant factor. In this case, Laberge is benefitting financially from the public use of the range to the tune of nearly $20,000 per year in voluntary contributions. Laberge accounts for these revenues, and generally uses them to help defray the costs associated with the range-including the property taxes and insurance on the property that would apply regardless of the presence of the range. This is unquestionably a substantial net benefit to Laberge. Whether the "commercial purpose" requirement in Act 250 is designed to target activity perceived to be more impactful, or whether it's designed to distinguish personal use from use that is for-profit, *556 revenues of this level clearly implicate the concerns underlying the "commercial purpose" requirement.
¶ 51. A rule that confers Act 250 jurisdiction when a would-be developer realizes substantial value in exchange for providing goods, services, or facilities, the activity constitutes a "commercial purpose"-the rule I believe we articulated clearly in Spring Brook Farm-is not perfect, but it is much more defensible from the perspective of the purposes of Act 250 and simple logic. Because I conclude that in this case Laberge did receive substantial value in exchange for public access to the shooting range, I would remand for determination of whether the neighbors can establish the requisite development to trigger Act 250 jurisdiction.
¶ 52. I am authorized to state that Chief Justice Reiber joins this dissent.